SHILKRET, Infant, etc. et al. *v.* THE ANNAPOLIS
EMERGENCY HOSPITAL ASSOCIATION,
ETC. ET AL.

[No. 7, September Term, 1975.]

*Decided October 8, 1975.*

The cause was argued before Murphy, C. J., and Singley, Smith, Digges, Levine, Eldridge and O'Donnell, JJ.

*John Wheeler Glenn*, with whom were *O'Connor, Preston & Glenn, P.A.* on the brief, for appellants.

*John F. King*, with whom was *Frederick G. Savage* on the brief, for appellees.

Levine, J., delivered the opinion of the Court.

In this appeal, which stems from a negligence action brought against several physicians and a hospital, we are asked to decide upon the proper standard of care to be applied in medical malpractice cases.

At the trial of the case in the Circuit Court for Anne Arundel County, the court (Wray, J.) ruled that the standard to be applied was the "strict locality" rule (the standard of care exercised by physicians in the defendant's own community or locality), and since appellants, who were plaintiffs below, had failed to meet the requirements of that rule, directed a verdict for appellees. The Court of Special Appeals affirmed that decision in an unreported per curiam opinion. *Shilkret v. Annapolis Emergency Hospital Association T/A The Anne Arundel General Hospital, et al.,* [No. 83, September Term, 1974, filed November 12, 1974]. We granted certiorari for the limited purpose of deciding whether the Court of Special Appeals was correct in holding "that [in Maryland] the 'Strict Locality Rule' must be applied" in medical malpractice cases.

According to the agreed statement of facts filed in lieu of a record extract, the infant plaintiff, Mark Alan Shilkret, was born at the Anne Arundel General Hospital (Anne Arundel) on December 22, 1968, and has been continuously institutionalized since that date because of brain damage

that appellants allege resulted from intracranial bleeding caused by negligence at delivery. This was allegedly complicated by subsequent treatment rendered by appellees, the various attending physicians and the hospital. The several physicians who are appellees here include two obstetricians who treated the mother throughout the prenatal stage and then delivered the infant, an anesthesiologist in attendance at birth, and a pediatrician at the hospital who allegedly examined the infant the day after his birth.[1]

At the trial, after excerpts from the depositions of the four defendant-physicians had been admitted in evidence, argument ensued over the applicable standard of care. When the court indicated that it would apply "the strict locality rule," appellants conceded that they could not prove their case against appellees under that standard and requested leave to make a proffer of expert medical testimony which "could meet any other rule in medical negligence cases." They were afforded this opportunity and proceeded with extensive statements of what their two experts, an obstetrician-gynecologist and a neurosurgeon, would say if called as witnesses. Each expert had an impressive curriculum vitae.

The proffered testimony of the obstetrician-gynecologist established that Anne Arundel belongs to the American Hospital Association, one of several members of the accrediting body known as the Joint Commission on Accreditation of Hospitals.[2] It was his opinion that all hospitals belonging to this group meet a national standard in caring for obstetrical patients. At the time of the infant's birth, the witness had been chief of the obstetrical-gynecological services at the U. S. Army Hospital at Aberdeen Proving Ground. He believed that in this branch of medicine, the standards at Anne Arundel were the same as those observed at Aberdeen and at all other accredited

---

1. Initially, six physicians were sued but the plaintiffs ultimately dismissed the action against two of them.

2. The record reveals that Anne Arundel is accredited by the Joint Commission.

hospitals in the United States. Similarly, as a member of the American College of Gynecologists and Obstetricians, and being board certified, he believed that a national standard of care applied to those with the same qualifications. He then detailed how the failure of the four physicians and the hospital to meet the national standards of care applicable to them resulted in the injury to the plaintiff.

The other expert witness whose testimony was proffered would have stated in some detail that he was employed as a neurosurgeon at the National Institutes of Health at Bethesda, Maryland, that a national standard of care is observed in the diagnosis and treatment of neurological diseases, the knowledge of which is also possessed by general practitioners, and that each of the defendants had violated what he believed to be a national standard regarding the care of newborn infants.

Following these proffers, the trial judge granted each appellee's motion for a directed verdict. He adhered to his previously pronounced belief that the "strict locality" standard applies in Maryland, rather than the "national" (in which the standard of care is not tied to a particular geographic locality) or "similar locality" (the standard of care observed by physicians of ordinary skill and care in either the defendant-physician's locality or in a similar community) tests urged by appellants, and therefore ruled that the latter had failed to present a sufficient case for the jury. The Court of Special Appeals affirmed, holding that its own prior cases — and the decisions of this Court — compelled this result. For reasons that follow, we reverse.

The general principles which ordinarily govern in negligence cases also apply in medical malpractice claims. *Benson v. Mays,* 245 Md. 632, 636, 227 A. 2d 220 (1967); *Sub. Hospital Ass'n v. Mewhinney,* 230 Md. 480, 484, 187 A. 2d 671 (1963). Therefore, as in any other case founded upon negligent conduct, the burden of proof rests upon the plaintiff in a medical malpractice case to show a lack of the requisite skill or care on the part of the defendant. *Id.* But, whereas the conduct of the average layman charged with

negligence is evaluated in terms of the hypothetical conduct of a reasonably prudent person acting under the same or similar circumstances, the standard applied in medical malpractice cases must also take into account the specialized knowledge or skill of the defendant. W. Prosser, Torts § 32 (4th ed. 1971); McCoid, *The Care Required Of Medical Practitioners*, 12 Vand. L. Rev. 549, 558 (1959). The formulation of a standard of care that is consistent with these well established tort principles, but which is fair to both the patient and his physician, has troubled the courts for the past century.

Recently, in *Raitt v. Johns Hopkins Hospital*, 274 Md. 489, 499-500, 336 A. 2d 90 (1975), where we held that an expert medical witness need not necessarily reside or practice in the defendant's community to testify as to the applicable standard of care in a medical malpractice case, we intimated that despite the plethora of reported medical malpractice decisions in Maryland, this Court actually had never been confronted with the need to adopt a standard of care from among the three we have mentioned.

In *State, use of Janney v. Housekeeper*, 70 Md. 162, 172, 16 A. 382 (1889), the standard of care which this Court applied was ". . . that reasonable degree of care and skill which physicians and surgeons ordinarily exercise in the treatment of their patients . . . ." *Accord, Dashiell v. Griffith*, 84 Md. 363, 380-81, 35 A. 1094 (1896) ("the amount of care, skill and diligence required is not the highest or greatest, but only such as is ordinarily exercised by others in the profession generally"); *cf. McClees v. Cohen*, 158 Md. 60, 66, 148 A. 124 (1930). As we noted in *Raitt*, this rule, which makes no reference to the defendant-physician's community, was followed in this state prior to 1962. *See Lane v. Calvert*, 215 Md. 457, 462, 138 A. 2d 902 (1958) (standard of care "such as is ordinarily exercised by others in the profession generally"). Indeed, it has been quoted occasionally since 1962. *Nolan v. Dillon*, 261 Md. 516, 534, 276 A. 2d 36 (1971) (standard of care "such as is ordinarily exercised by others in the profession generally"); *Johns Hopkins Hospital v. Genda*, 255 Md. 616, 620, 258 A. 2d 595 (1969) ("the standard

of skill and care ordinarily exercised by surgeons in cases of this kind"), *accord, Anderson v. Johns Hopkins Hosp.*, 260 Md. 348, 350, 272 A. 2d 372 (1971).

This Court applied the strict locality rule for the first time in *State, use of Solomon v. Fishel*, 228 Md. 189, 179 A. 2d 349 (1962), the purported authority for this proposition in Maryland. lt is important to note, however, that *Fishel* did not turn on the standard of care issue, but dealt with the proper use of hypothetical questions addressed to medical experts and with a jury instruction involving the plaintiff's burden of proof. Similarly, although references to the strict locality rule, citing *Fishel*, appear in *Tempchin v. Sampson*, 262 Md. 156, 277 A. 2d 67, 51 A.L.R.3d 1268 (1971), and *Kruszewski v. Holz*, 265 Md. 434, 290 A. 2d 534 (1972), we were not directly confronted with the standard of care issue in either of those cases.

The only reported decision to flatly hold that the strict locality rule applies in Maryland is *Dunham v. Elder*, 18 Md. App. 360, 306 A. 2d 568 (1973), which we did not have occasion to review. There, the Court of Special Appeals read *Fishel* to stand for the application of the stricter rule. In applying the same rule in this case, the two courts below relied heavily on *Dunham*, but we hasten to point out that the portents in *Raitt* were not yet available to them.

In any event, we now explicitly decide for the first time this question of the standard of care to be applied in medical malpractice cases. It should hardly come as a surprise that appellants advocate the adoption of the national standard or, alternatively, the similar locality rule. They claim that their proof satisfied both tests. Appellees, on the other hand, contend for the strict locality rule.

In addressing this issue, we note at the outset that we are dealing with two types of defendants, physicians and hospitals.

(1)

The Standard of Care Applicable to Physicians

The earliest traces of the strict locality rule appeared a

century ago. *Smothers v. Hanks,* 34 Iowa 286 (1872); *Tefft v. Wilcox,* 6 Kan. 46 (1870); *Hathorn v. Richmond,* 48 Vt. 557, 559 (1876) ("such skill as doctors in the same general neighborhood, in the same general lines of practice, ordinarily have and exercise in like cases"). It is an exclusive product of the United States; possibly because of the difference in the size of the two countries, the English courts have never developed such a principle. Waltz, *The Rise And Gradual Fall Of The Locality Rule In Medical Malpractice Litigation,* 18 DePaul L. Rev. 408 (1969). The rule was unquestionably developed to protect the rural and small town practitioner, who was presumed to be less adequately informed and equipped than his big city brother. *Id.* The court reasoned with what was then unassailable logic in *Tefft v. Wilcox, supra,* 6 Kan. at 63-64:

". . . In the smaller towns and country, those who practice medicine and surgery, though often possessing a thorough theoretical knowledge of the highest elements of the profession do not enjoy so great opportunities of daily observation and practical operations, where the elementary studies are brought into every day use, as those have who reside in the metropolitan towns, and though just as well informed in the elements and literature of their profession, they should not be expected to exercise that high degree of skill and practical knowledge possessed by those having greater facilities for performing and witnessing operations, and who are, or may be constantly observing the various accidents and forms of disease. . . ."

In short, the rationale underlying the development of the strict locality rule a century ago was grounded in the manifest inequality existing in that day between physicians practicing in large urban centers and those practicing in remote rural areas.

Ultimately, the rule came under sharp attack on two grounds. First, "[i]t effectively immunized from malpractice liability any doctor who happened to be the sole practitioner

in his community. He could be treating bone fractures by the application of wet grape leaves and yet remain beyond the criticism of more enlightened practitioners from other communities." Waltz, *supra* at 411. Secondly, a "conspiracy of silence" in the plaintiff's locality could effectively preclude any possibility of obtaining expert medical testimony. Note, 40 Fordham L. Rev. 435, 438 (1971).[3]

Whatever may have justified the strict locality rule fifty or a hundred years ago, it cannot be reconciled with the realities of medical practice today.[4] "New techniques and discoveries are available to all doctors within a short period of time through medical journals, closed circuit television presentations, special radio networks for doctors, tape recorded digests of medical literature, and current correspondence courses." Note, *An Evaluation Of Changes In The Medical Standard Of Care*, 23 Vand. L. Rev. 729, 732 (1970). More importantly, the quality of medical school training itself has improved dramatically in the last century. Where early medical education consisted of a course of lectures over a period of six months, which was supplemented by apprenticeships with doctors who had even less formal education, there now exists a national accrediting system which has contributed to the standardization of medical schools throughout the country. *Id.* n. 16.

A distinct minority of states, however, cling to the strict locality rule. *Horton v. Vickers*, 142 Conn. 105, 111 A. 2d 675, 679 (1955) ("in the same general neighborhood"), *accord,*

---

3. This problem, of course, has been obviated in Maryland by our decision in *Raitt.*

4. The absurdity of coupling the standard of care with the doctor's community is aptly illustrated in Brune v. Belinkoff, 354 Mass. 102, 235 N.E.2d 793 (1968), in which the Supreme Judicial Court of Massachusetts overruled its earlier decision in Small v. Howard, 128 Mass. 131, 35 Am. Rep. 363 (1880), containing one of the first enunciations of the similar locality rule. In *Brune*, which involved an act of alleged malpractice in the City of New Bedford, slightly more than 50 miles from Boston, the trial judge had instructed the jury: " '. . . If, in a given case, it were determined by a jury that the ability and skill of the physician in New Bedford were fifty percent inferior to that which existed in Boston, a defendant in New Bedford would be required to measure up to the standard of skill and competence and ability that is ordinarily found by physicians in New Bedford.' " 235 N.E.2d at 795.

*Levett v. Etkind,* 158 Conn. 567, 265 A. 2d 70, 41 A.L.R.3d 1343 (1969); *Lockart v. Maclean,* 77 Nev. 210, 361 P. 2d 670 (1961); *Gandara v. Wilson,* 85 N. M. 161, 509 P. 2d 1356, 1358 (1973) ("recognized standards of medical practice in the community"); *see Bertrand v. Aetna Casualty & Surety Company,* 306 So. 2d 343, 347 (La. App. 1975) ("in the same community or locality"). Nevertheless, recognizing the significant developments which have occurred in the training and practice of medicine, and the population shifts which have marked the increased urbanization of our society, a majority of American courts have now abandoned the strict locality rule as being too narrow. We, too, conclude that it can be sustained no longer given the current state of medical science.

We have noted that one of the earliest applications of the similar locality rule occurred in *Small v. Howard, supra,* 128 Mass. at 136, where, essentially for the same reasons that have traditionally undergirded the strict locality rule, the court enunciated as the standard: " 'that skill only which physicians and surgeons of ordinary ability and skill, practising in similar localities, with opportunities for no larger experience, ordinarily possess' "; thus the defendant " 'was not bound to possess that high degree of art and skill possessed by eminent surgeons practising in large cities, and making a specialty of the practice of surgery.' "

A plurality, if not a majority, of states apply the similar locality rule. *Sinz v. Owens,* 33 Cal. 2d 749, 205 P. 2d 3, 5, 8 A.L.R.2d 757 (1949) (" 'same locality' or 'vicinity' "); *McGulpin v. Bessmer,* 241 Iowa 1119, 43 N.W.2d 121, 126 (1950) ("under like circumstances and in like localities"); *Karrigan v. Nazareth Convent & Academy, Inc.,* 212 Kan. 44, 510 P. 2d 190, 195 (1973) (" 'in the community where he practices or similar communities' "); *Mecham v. McLeay,* 193 Neb. 457, 227 N.W.2d 829, 832 (1975) ("in the same neighborhood and in similar communities"); *Wiggins v. Piver,* 276 N. C. 134, 171 S.E.2d 393 (1970); *Runyon v. Reid,* 510 P. 2d 943, 950 (Okla. 1973) ("by similar specialist . . . in the same or similar communities"); *Incollingo v. Ewing,* 444 Pa. 263, 282 A. 2d 206, 214 n. 5a (1971) ("in the same or a

similar locality or community"); *Hundley v. Martinez*, 151 W. Va. 977, 158 S.E.2d 159, 169 (1967); *see also Williams v. Chamberlain*, 316 S.W.2d 505, 510 (Mo. 1958); *Cavallaro v. Sharp*, 84 R. I. 67, 121 A. 2d 669, 672 (1956).

The similar locality rule answers some of the criticism aimed at the strict locality standard by enabling the plaintiff to obtain expert witnesses from different communities, thus reducing the likelihood of their acquaintance with the defendant. It does not, however, effectively alleviate the other potential problem, a low standard of care in some of the smaller communities, because the standard in similar communities is apt to be the same. Another criticism leveled at the similar locality rule is the difficulty which arises in defining a "similar" locality.[5] For these reasons, the similar locality rule is regarded as no more than a slight improvement over the stricter standard.

These deficiencies in the locality rules and the increasing emphasis on the availability of medical facilities have led some courts to dilute the rules by extending geographical boundaries to include those centers that are readily accessible for appropriate treatment. *See generally Sinz v. Owens, supra; Gist v. French*, 136 Cal.App.2d 247, 288 P. 2d 1003 (1955); *McGulpin v. Bessmer, supra; Josselyn v. Dearborn*, 143 Me. 328, 62 A. 2d 174 (1948); *Viita v. Dolan*, 132 Minn. 128, 155 N. W. 1077 (1916); *Tvedt v. Haugen*, 70 N. D. 338, 294 N. W. 183, 132 A.L.R. 379 (1940). This expanded rule, expressed in terms of "medical neighborhood" or "medical locality," has paved the way for the national standard. In any event, the trend continues away from standards which rest solely on geographic considerations.

5. One standard which has been applied is geographic proximity between communities, which retains much of the "same" locality flavor. Other courts have considered socio-economic factors such as population, type of economy, size of city, and income of inhabitants. Most courts applying this standard, however, have adopted the view that "similar" locality should be defined in terms of medical factors such as the existence of research and laboratory facilities, medical schools, teaching hospitals and modern equipment in the localities to be compared. The commentators agree that this is the most logical application of the rule when measured against a major reason for its adoption — the availability of resources which will enable the physician to maintain the standard of his practice. *See generally* Note, 40 Fordham L. Rev. 435, 439 (1971); Note, *Medical Malpractice — Expert Testimony*, 60 Nw. U. L. Rev. 834, 838 (1966); Note, *Medical Specialties And The Locality Rule*, 14 Stan. L. Rev. 884, 890 (1962).

Ever-increasing emphasis on medical specialization has accelerated the erosion of the locality rules and the concomitant emergence of the so-called national standard.[6] Even within the framework of the locality rules, it has been generally accepted that where a physician holds himself out as a specialist, he is held to a higher standard of knowledge and skill than a general practitioner. Some courts, therefore, have abandoned the locality rules for a national standard only as to specialists. *Kronke v. Danielson,* 108 Ariz. 400, 499 P. 2d 156, 159 (1972) ("the standard of care required of physicians in the same specialty practiced by the defendant"); *Brune v. Belinkoff, supra,* 235 N.E.2d at 798 ("a specialist should be held to the standard of care and skill of the average member of the profession practising the specialty, taking into account the advances in the profession");[7] *Naccarato v. Grob,* 384 Mich. 248, 180 N.W.2d 788, 791 (1970) ("that of a reasonable specialist practicing medicine in the light of present day scientific knowledge"); *Christy v. Saliterman,* 288 Minn. 144, 179 N.W.2d 288 (1970); *see Belk v. Schweizer,* 268 N. C. 50, 149 S.E.2d 565, 21 A.L.R.3d 944 (1966). This is consistent with the position of the American Law Institute which otherwise adopts the similar locality rule.[8]

---

**6.** The editorial board of one law review conducted a survey to determine the extent to which the practice of medicine by certified specialists within each of the 19 specialties recognized by the American Medical Association is similar throughout the country. On the basis of the existence of standardized requirements for certification, subscription to medical specialty journals, specialist societies, and statements from national specialty boards, it was concluded that the practice of medicine by certified specialists within most medical specialties is similar throughout the country. Note, *Medical Specialties And The Locality Rule,* 14 Stan. L. Rev. 884, 887-89 (1962).

**7.** Though it was there dealing with a specialist, the court also stated in dictum:

> "The proper standard is whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession." 235 N.E.2d at 798.

We read this case to stand for the same rule as applied to both specialists and general practitioners.

**8.** "Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and

198

Were we to adopt a standard tied to locality for specialists, we would clearly be ignoring the realities of medical life. As we have indicated, the various specialties have established uniform requirements for certification. The national boards dictate the length of residency training, subjects to be covered, and the examinations given to the candidates for certification. Since the medical profession itself recognizes national standards for specialists that are not determined by geography, the law should follow suit.

The courts in another group of cases, however, have gone further, and have adopted this same standard of care — one which is not governed by the locality of the defendant — for all physicians regardless of whether they are specialists or not. *Blair v. Eblen*, 461 S.W.2d 370, 372-73 (Ky. 1970) ("that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances"); *Pederson v. Dumouchel*, 72 Wash. 2d 73, 431 P. 2d 973, 978, 31 A.L.R.3d 1100 (1967) ("that degree of care and skill which is expected of the average practitioner in the class to which he belongs, acting in the same or similar circumstances"),[9] *accord, Douglas v. Bussabarger*, 73 Wash. 2d 476, 438 P. 2d 829, 837-38 (1968); *Shier v. Freedman*, 58 Wis. 2d 269, 206 N.W.2d 166, 174 (1973) ("that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances").

knowledge normally possessed by members of that profession or trade in good standing in similar communities." Restatement (Second) of Torts § 299 A (1965).

Comment d provides:

"An actor undertaking to render services may represent that he has superior skill or knowledge, beyond that common to his profession or trade. . . . Thus a physician who holds himself out as a specialist in certain types of practice is required to have the skill and knowledge common to other specialists. . . ."

9. The Washington court did go on to add: ". . . This standard of care is that established in an area coextensive with the medical and professional means available in those centers that are readily accessible for appropriate treatment of the patient. . . ." 431 P. 2d at 978. We read this to mean that accessibility of medical centers is one of the factors to be considered in applying the standard of care.

We agree with these courts that justification for the locality rules no longer exists. The modern physician bears little resemblance to his predecessors. As we have indicated at length, the medical schools of yesterday could not possibly compare with the accredited institutions of today, many of which are associated with teaching hospitals. But the contrast merely begins at that point in the medical career: vastly superior postgraduate training, the dynamic impact of modern communications and transportation, the proliferation of medical literature, frequent seminars and conferences on a variety of professional subjects, and the growing availability of modern clinical facilities are but some of the developments in the medical profession which combine to produce contemporary standards that are not only much higher than they were just a few short years ago, but also are national in scope.

In sum, the traditional locality rules no longer fit the present-day medical malpractice case.

Moreover, while a specialist may be held to greater skill and knowledge in his particular field than would be required of a general practitioner under the same or similar circumstances, one standard can be fashioned for all physicians as the Kentucky, Washington and Wisconsin courts have carefully demonstrated. To that extent, there is no valid basis for distinguishing between general practitioners and specialists in applying standards of care. Although national board certification in the specialties has contributed significantly to standardization on a nation-wide scale, all of the other reasons which justify a national standard of care apply with equal validity to general practitioners.

Nevertheless, in one important respect there is even a difference of opinion among those three courts and the Massachusetts court. As we noted earlier, the Massachusetts court articulated two standards, one for the *"average* qualified practitioner" and the other for the *"average* member of the profession practising [a] specialty." *Brune v. Belinkoff, supra,* 235 N.E.2d at 798 (emphasis added). Similarly, the Washington court framed its standard in

terms of "an *average*, competent practitioner," *Pederson v. Dumouchel*, 431 P. 2d at 978 (emphasis added), and the Wisconsin court postulated its rule for the "*average* practitioner," *Shier v. Freedman*, *supra*, 206 N.W.2d at 174 (emphasis added). The Kentucky Court of Appeals, however, substituted "the term 'reasonably competent' for the term 'average' used in the Washington Court's definition." *Blair v. Eblen*, *supra*, 461 S.W.2d at 373.

In eschewing the term "average," the Kentucky court sided with the American Law Institute, which, in comment e to Restatement (Second) of Torts § 299 A (1965), states:

> ". . . [The standard] is not that of the most highly skilled, nor is it that of the average member of the profession . . . , since those who have less than median or average skill may still be competent and qualified. Half of the physicians of America do not automatically become negligent in practicing medicine at all, merely because their skill is less than the professional average. On the other hand, the standard is not that of the charlatan, the quack, the unqualified or incompetent individual who has succeeded in entering the profession . . . ."

Or, as one learned scholar aptly stated, ". . . a true 'average' would involve an uneasy aggregation of the best and the worst, the experienced and the inexperienced, the quack and the specializing medical doctor. It has never been suggested that the law strikes the average from so diverse a grouping." Waltz, *supra* at 409 n.1. Although "average" is probably expressed in the sense of "ordinary," this meaning may not be conveyed to the jury despite an explicit instruction on the point. *McCoid*, *supra* at 559.

We align ourselves with the Kentucky court and hold that a physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances. Under this standard, advances in the profession, availability of facilities, specialization or general practice, proximity of specialists

and special facilities, together with all other relevant considerations, are to be taken into account.

## (2)
## The Standard of Care Applicable to Hospitals

In reviewing some of our medical malpractice decisions earlier, we intimated that neither of the locality rules has been applied in Maryland where a hospital has been the defendant. *Anderson v. Johns Hopkins Hosp., Johns Hopkins Hospital v. Genda,* both *supra.* Equally significant is the absence in our prior cases of any distinction between physicians and hospitals regarding the applicable standard of care. As the court stated in *Pederson v. Dumouchel, supra,* 431 P. 2d at 978, "[m]uch that we have said [in articulating the standard of care applicable to physicians] also applies to the jury instructions given concerning hospitals. They, too, are members of national organizations and subject to accreditation." Courts elsewhere have tended to apply the same standards to hospitals that they apply to physicians. *Avey v. St. Francis Hosp.,* 201 Kan. 687, 442 P. 2d 1013, 1022 (1968) ("similar communities"); *Carrigan v. Roman Catholic Bishop,* 104 N. H. 73, 178 A. 2d 502, 503 (1962) ("same or similar localities"); *cf. Darling v. Charleston Community Memorial Hosp.,* 50 Ill.App.2d 253, 200 N.E.2d 149 (1964), *aff'd,* 33 Ill. 2d 326, 211 N.E.2d 253, 14 A.L.R.3d 860 (1965), *cert. denied,* 382 U. S. 946, 86 Sup. Ct. 1204, 16 L.Ed.2d 209 (1966); *see generally* Note, *Non-Resident Expert Testimony On Local Hospital Standards.* 18 Clev. St. L. Rev. 493 (1969).

The only case, of which we are aware, to make a distinction of any kind between physicians and hospitals is *Duling v. Bluefield Sanitarium, Inc.,* 149 W. Va. 567, 142 S.E.2d 754, 764 (1965). There, the court, although adhering to the similar locality rule in medical malpractice cases, held that an action brought against a hospital because of a nurse's carelessness, as distinguished from that of a physician, is founded solely on negligence and want of due care. Hence, the proper standard was held to be "reasonable care."

In *Dickinson v. Mailliard*, 175 N.W.2d 588, 596, 36 A.L.R.3d 425 (Iowa 1970), the court, in adopting as a standard "that which obtains in hospitals generally under similar circumstances," stated:

> ". . . It is doubtful today if there is any substantial difference from one locality to another in the type of hospital services rendered. Hospitals must now be licensed and accredited. They are subject to statutory regulation. In order to obtain approval they must meet certain standard requirements. . . . It is no longer justifiable, if indeed it ever was, to limit a hospital's liability to that degree of care which is customarily practiced in its own community. . . . [M]any communities have only one hospital. Adherence to such a rule, then, means the hospital whose conduct is assailed is to be measured only by standards which it has set for itself. There is no other hospital to which it may be compared."

We think the same reasoning is apposite here. Hospitals in general, and Anne Arundel in particular, are accredited by the Joint Commission on Accreditation. This group establishes national standards to which all hospitals seeking accreditation must conform. In addition, hospitals in Maryland are subject to a rigorous regulatory scheme which promotes statewide standards. *See* Maryland Code (1957, 1971 Repl. Vol.) Art. 43, §§ 556 *et. seq.* These factors, together with much of what we said earlier regarding physicians, warrant the adoption of a standard of care for hospitals which conforms to that applied in cases against physicians.

We hold, therefore, that a hospital is required to use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances. As in cases brought against physicians, advances in the profession, availability of special facilities and specialists, together with all other relevant considerations, are to be taken into account.

Here, there was evidence that there is a national standard

of care for accredited hospitals in the prenatal, intrapartum and perinatal periods of pregnancy. Similarly, the evidence proffered by appellants showed national standards of care for child delivery, infant care, and the treatment of neurological problems generally, and the measure of vital functions specifically, that are observed by specialists and general practitioners alike. Under our holdings here, this evidence was sufficient to take the standard of care issue to the jury as to all of the appellees. Our review, as we observed at the outset, has been limited to this question. Whether the evidence was sufficient to establish a failure to comply with the applicable standards of care, and, if so, whether said failure directly caused the injuries sustained by the infant plaintiff, are questions which we do not reach here.

*Judgment of the Court of Special Appeals reversed; remanded to that court with instructions to remand the case as against all appellees to the Circuit Court for Anne Arundel County for a new trial; appellees to pay costs.*