**Anthony J. Russo and J. A. Russo Paving, Inc.
v. H. Vaughn Griffin, Jr. and Griffin & Griffin, Ltd.**

[510 A.2d 436]

No. 83-462

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes, JJ.**

Opinion Filed March 28, 1986

*Plante, Richards, Terino & Hanley, P.C.*, White River Junction, for Plaintiffs-Appellants.

*Lisa Chalidze* of *Dick, Hackel & Hull*, Rutland, for Defendants-Appellees.

**Hill, J.** This is a legal malpractice action. The trial court found for defendants, H. Vaughn Griffin, Jr. and Griffin & Griffin, Ltd., and entered judgment on their behalf. Plaintiff, J. A. Russo Paving, Inc., appealed. We reverse.

Sometime during the 1930's Joseph Russo established a paving business in Rutland, Vermont. In 1975, Mr. Russo decided to turn the business over to his two sons, Anthony (Tony) and Francis (Frank). They approached defendant Griffin, a lawyer in the Rutland area, to help them with the process of incorporation. As their attorney, defendant Griffin drew up the corporate charter, filed it with the Secretary of State and arranged the necessary transfer of assets. Between 1975 and 1978 the corporation held its annual meetings at Mr. Griffin's office.

In early 1978, Frank entertained thoughts of purchasing a laundromat in Rutland, and he entered into discussions with his brother concerning the sale of his interest in the corporation. The father, who was not happy with the proposed arrangements, eventually got involved in the negotiations, which culminated in a meeting at Mr. Griffin's office.

According to defendant Griffin, the main purpose of the meeting, and the documents he prepared pursuant thereto, was to protect Frank. In this regard, a $6,000 promissory note from the corporation to Frank Russo was personally guaranteed by Tony Russo and his wife, and it was secured by a chattel mortgage. In

return, Frank resigned as president and transferred his stock to the corporation.

At no time during the meeting did defendant Griffin inform the corporation or Tony Russo, the sole remaining shareholder, of the desirability of obtaining a covenant not to compete or explain the implications thereof. Three months after the stock transfer, Frank went back into the paving business in Rutland in direct competition with the plaintiff corporation. A properly drafted noncompetition covenant would have prevented this from occurring.

At trial, plaintiff introduced two expert witnesses, both well-respected practicing attorneys from the Burlington area, who testified that defendant Griffin's failure to advise the corporation to exact a covenant not to compete deviated from the standard of care required of attorneys practicing in Vermont at that time. Defendants introduced two similarly qualified Rutland attorneys who testified that defendant Griffin's conduct comported with the standard of care then expected of Rutland attorneys.

The question for determination was clearly whether defendant Griffin's conduct violated the attorney standard of care as it existed at the time of the alleged breach. In answering this question, the trial court focused on the long-standing professional relationship between defendant Griffin and the Russo family and the fact that this was not an arms-length transaction. It did not, however, find these facts to be dispositive. The court ultimately chose to accept the testimony of defendants', rather than plaintiff's, expert witnesses on the premise that "those attorneys whose practice primarily was conducted in the Rutland area prior to and during 1978 are more familiar with the standard of care then required of lawyers."

Defendants claim that the trial court was more concerned with the time frame of the alleged act of malpractice then the locale in which it occurred. We cannot agree. In ruling for the defendants, the court found the relevant standard of care to be limited to what a careful and prudent practitioner in the Rutland area would do under the circumstances. The court concluded:

> The *standard of care in the Rutland area* in 1978 required of an attorney did not require him to suggest or recommend to a purchasing client that a noncompete agreement be obtained from a seller who is a relative and who has been a

business associate for several years, the transaction not being one at arms length. (Emphasis added).

In *Hughes* v. *Klein*, 139 Vt. 232, 233, 427 A.2d 353, 354 (1981), this Court held that the standard of care within the legal profession required lawyers to exercise "the customary skill and knowledge which normally prevails at the time and place." We are now asked to reexamine the underlying rationale and continued vitality of the so-called locality rule.

The locality rule is an exclusive product of the United States. See *Shilkret* v. *Annapolis Emergency Hospital Association*, 276 Md. 187, 193, 349 A.2d 245, 248 (1975). It was first applied to the medical profession approximately a century ago when there existed a great disparity between standards of practice in large urban centers and remote rural areas. *Id.* at 193, 349 A.2d at 249. "The rule was unquestionably developed to protect the rural and small town practitioner, who was presumed to be less adequately informed and equipped than his big city brother." *Id.* at 193, 349 A.2d at 248.

The shortcomings of the locality rule are well recognized. It immunizes persons who are sole practitioners in their community from malpractice liability and it promotes a "conspiracy of silence" in the plaintiffs' locality which, in many cases, effectively precludes plaintiffs from retaining qualified experts to testify on their behalf. *Id.* at 193-94, 349 A.2d at 249 (citing Waltz, *The Rise and Gradual Fall of the Locality Rule In Medical Malpractice Litigation*, 18 DePaul L. Rev. 408, 411 (1969); Note, *Medical Malpractice—Michigan Abandons "Locality Rule" with Regard to Specialists*, 40 Fordham L. Rev. 435, 438 (1971)). Recent developments in technology and the trend toward standardization have further undermined support for the rule. See *Shilkret, supra*, 276 Md. at 197, 349 A.2d at 250.

■ According to defendants, the reasoning of the courts which have rejected the locality rule in medical malpractice decisions is inapposite to legal malpractice. We disagree.

> The ability of the practitioner and the minimum knowledge required should not vary with geography. The rural practitioner should not be less careful, less able or less skillful than the urban attorney. The fact that a lower degree of care or less able practice may be prevalent in a particular local community should not dictate the standard of care.

Mallen & Levit, Legal Malpractice § 254, at 334 (2d ed. 1981). Defendants correctly note that "knowledge of local practices, rules, or customs may be determinative of, and essential to, the exercise of adequate care and skill." *Id.* To argue this fact in support of continued application of the locality rule, however, is to confuse "the *degree* of 'skill and knowledge' and the relevance of local factors which constitute the *knowledge* required by the standard of care." *Id.* at 337. Although attorneys throughout this state may be required to familiarize themselves with local practices, rules or customs peculiar to their area, the crucial inquiry for malpractice purposes turns not on the substance of the underlying practice, rule, or custom but on whether a reasonable and prudent attorney can be expected to know of its existence and practical applications.

In selecting a territorial limitation on the standard of care, we believe that the most logical is that of the state. See Mallen & Levit, *supra,* at 336; see also Restatement (Second) of Torts § 299A comment g (1965) (allowance for variations in type of community or degree of skill and knowledge possessed by practitioners therein has seldom been made in legal profession as such variations either do not exist or are not worthy of recognition). In Vermont, the rules governing the practice of law do not vary from community to community but are the same throughout the state. Moreover, in order to practice law in Vermont attorneys must successfully complete the requirements for admission established by this Court and administered by the Vermont Board of Bar Examiners. Among these prerequisites is the requirement that all candidates for admission complete a study of law in the office of a judge or practicing attorney in this state.

■ The relevant geographic area then is not the community in which the attorney's office is located or the nation as a whole, but the jurisdiction in which the attorney is licensed to practice. Accordingly, we hold that the appropriate standard of care to which a lawyer is held in the performance of professional services is "that degree of care, skill, diligence and knowledge commonly possessed and exercised by a reasonable, careful and prudent lawyer in the practice of law in this jurisdiction." *Cook, Flanagan & Berst* v. *Clausing,* 73 Wash. 2d 393, 395, 438 P.2d 865, 867 (1968); see also *Ramp* v. *St. Paul Fire & Marine Insurance Co.,* 254 So. 2d 79, 82 (La. App. 1971) (attorney liable for failure to exercise that degree of care, skill and diligence which is commonly pos-

sessed and exercised by practicing attorneys in his or her jurisdiction); *Hodges* v. *Carter*, 239 N.C. 517, 520, 80 S.E.2d 144, 146 (1954) (attorney not liable for following service of process custom which had prevailed in state for two decades and was followed generally by attorneys throughout the state); *Feil* v. *Wishek*, 193 N.W.2d 218, 225 (N.D. 1971) (attorney liable for failure "to exercise that degree of care commonly possessed and exercised by other reasonable, careful and prudent lawyers of this State").

Unlike the medical profession, the legal profession has not yet established a certification and licensing process which is national in scope. *Mallen, supra,* § 254, at 337. Nevertheless, "[w]hen certain recognized specialities are involved a national standard may be appropriate." *Id.* These "national law" specialities might include federal taxation law, securities law, patent law, and bankruptcy law where the need for uniformity is clearly apparent. *Id.* at 338. Regardless of whether a state or national standard is applied, however, our holding points out the need to advise clients as to the limits of one's professional capabilities and to refer them to specialists in appropriate cases.

In this case, defendant Griffin, in advising a family-held business on how to structure a buy-out and drafting the documents necessary to the transaction, failed to inform his clients of the possible need for, and implications of, a covenant not to compete. Both sides presented expert testimony addressing whether this failure constituted attorney malpractice. In answering this question, the trial court erroneously applied the locality rule in defining the applicable standard of care. This ruling clearly prejudiced the plaintiffs as the court chose to accept the testimony of defendants', rather than plaintiff's, expert witnesses on the rationale that they were from the Rutland area, and therefore were more familiar with the applicable standard to care. Accordingly, the decision of the superior court is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

**Hayes, J.,** concurring in part and dissenting in part. I agree with the majority that the correct standard to which an attorney should be held in the performance of professional services is *not* the standard of his or her locality. If there are only two lawyers in

a small town, and both are incompetent, they cannot set a standard of inferiority for a third who comes to town.

I disagree with the Court's holding that the applicable standard of care should be a *state* standard. Doctors in Vermont are required to adhere to standards based upon the medical profession generally. Lawyers should be subject to a similar standard of care based on their profession.

The scope of an attorney's obligation to his or her client should not vary with geography. The law schools of today are truly national in legal training. Vermont and almost all other states give a multistate bar examination. Much of our continuing legal education is national in scope. Why then must candidates for admission to the Vermont bar clear a multistate hurdle, and be required to meet only a state standard for performance once admitted?

I would require that the standard of care for Vermont lawyers be based upon the legal profession generally, and I would.reject a state or local standard.

We are members of a profession that has not won a full measure of public confidence. To adopt a state standard is to say that what may be considered attorney negligence in New Hampshire may not violate the standard of adequacy of legal services in Vermont. Such a caliper to measure attorney conduct will lower public esteem for the Vermont legal profession and will arouse suspicions in lay circles that we have selected a cemetery in the Green Mountains in which quietly to bury the faults of our legal brothers and sisters.