Stephen P. KROLL, Individually and as Personal Representative of the Estate of Sonya P. Kroll, Decedent

v.

UNITED STATES of America.

Civ. No. PN–86–242.

United States District Court, D. Maryland.

Feb. 22, 1989.

**118**

Allan G. Slan, Shari L. Cohen and Katz, Frome, Slan and Bleecker, P.A., Kensington, Md., for plaintiff.

Breckinridge L. Willcox, U.S. Atty., and Susan M. Ringler and Roann Nichols, Asst. U.S. Attys., D. Md., for U.S.

## MEMORANDUM AND ORDER

NIEMEYER, District Judge.

Stephen P. Kroll, the personal representative of the estate of Sonya Kroll, has sued the United States for medical malpractice in connection with the treatment of Mrs. Kroll at the Bethesda Naval Hospital in March and April, 1983. Mr. Kroll contends that the malpractice of doctors at Bethesda Naval Hospital, in failing properly to treat an arrhythmic condition in her heart, led to an embolic stroke and caused Mrs. Kroll ultimately to die. Although the plaintiff does not contend that the malpractice caused the death of Mrs. Kroll, he does contend that it caused her to lose a substantial chance of survival.

The United States earlier filed a motion for summary judgment which the Court granted in part and denied in part. Mr. Kroll's own claim for wrongful death was dismissed because, as he conceded, there was no evidence to show that the alleged malpractice caused Mrs. Kroll's death. The motion to dismiss the remaining claim, a survival claim brought by her estate based on loss of a substantial chance of survival, was denied. This Court concluded that Maryland recognizes the loss of a substantial chance of survival as an element of damage. *Kroll v. U.S.*, 694 F.Supp. 1210, 1213 (D.Md.1988).

This case was tried to the Court on the survival action from October 31 through November 3, 1988. Following the submission of post trial briefs, oral argument was received on December 21, 1988. This Memorandum and Order constitutes the Court's findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P.

### I

Plaintiff has filed suit against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* In order to recover under this Act, the plaintiff must show that the defendant's conduct constituted malpractice under Maryland law. *See* 28 U.S.C. §§ 2674, 1346(b); *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

To establish malpractice in Maryland, the plaintiff must show that a failure by the defendant to conform to a standard of care caused plaintiff's damages. The Court of Appeals has restated the standard of care in *Shilkret v. Annapolis Emergency Hospital*, 276 Md. 187, 349 A.2d 245 (1975) where it stated:

> [A] physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances. Under this standard, advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations, are to be taken into account.

*Id.* at 200, 349 A.2d 245. The court also imposed the same standard of care on hospitals. *Id.* at 202, 349 A.2d 245. The applicable standard of care does not require that a doctor or hospital provide optimal care. *See Raitt v. Johns Hopkins Hospital*, 22 Md.App. 196, 322 A.2d 548 (1974) rev'd on other grounds, 274 Md. 489, 336 A.2d 90 (1974); *Dashiell v. Griffith*, 84 Md. 363, 35 A. 1094 (1896). The law only requires that the care be reasonably competent and be acceptable to other members of the medical profession. *See Suburban Hospital Association, Inc. v. Mewhinney*, 230 Md. 480, 187 A.2d 671 (1963). If a doctor is confronted with alternative treatments for a particular condition, either of which is acceptable, he may not be found negligent because the treatment chosen did not correct the plaintiff's condition. The choice between acceptable treatments is a question of medical judgment that is made in the circumstances confronting the physician and is not of itself the basis of a

breach of duty to conform to the standard of care.

The plaintiff is charged with the burden of establishing that a failure to conform to the standard of care proximately caused plaintiff's injury, *i.e.*, in this case, a loss of a substantial chance of survival. The nature of the injury claimed does not lessen the degree of causation that must be shown.

■ Even though the damage claimed is for loss of a chance, the Court will view the burden of proving damage like that in any other damage case. The damage must be proved with reasonable certainty and may not be based on guess work or speculation. As the Court of Appeals of Maryland said in *Cooper v. Hartman*, 311 Md. 259, 533 A.2d 1294 (1987), there must be a *probability* that the damage occurred, not merely a *possibility*. *Id.* at 270–71, 533 A.2d 1294.

■ The more difficult question is to define the nature of the damage claimed here. What is loss of a substantial chance of survival and how can it be valued? When defining the loss of chance as a damage element, it is easy to fall into a metaphysical formularization that has no real meaning in human experience. Based on the discussion of the court in *Cooper, supra*, the Court concludes that the plaintiff must prove with reasonable certainty that a substantial chance of survival was lost, defining a substantial chance as being more than *de minimis*, but less than 50%. If the chance lost were greater than 50%, then the damage would be for wrongful death, which is a claim that belongs to those left behind by the decedent. On the other hand, a claim for a loss of chance of survival belongs to the individual whose opportunity was damaged. Recognizing that everyone has a time certain for death, which may occur by reason of a multiplicity of causes, the essence of the damage for lost chance of survival therefore is the addition to one's life of further *potential* causes of death, "potential" because the addition of an actual cause of death leads to a claim for wrongful death. This potential cause of death, however, must give rise to loss of a *substantial* chance of surviv-ing. The lost chance must not be the loss of a "lottery ticket," but must be shown to have a real and substantial impact on the patient.

## II

Before March of 1983, Mrs. Kroll suffered from various conditions of age. She was being treated for hypertension (high blood pressure); she had a thyroid condition for which she was receiving medicine; and she had a minor history of cardiovascular disease, although she had never suffered a heart attack or stroke. She was being treated with medication by the Bethesda Naval Hospital in its Outpatient Clinic. Mr. and Mrs. Kroll had used that hospital as the family medical provider, whether it was for obtaining prescriptions, seeing a doctor, or receiving emergency treatment, because Mr. Kroll had access to it as a retired Air Force officer.

On March 25, 1983 after Mrs. Kroll had, for a period of three days, experienced chest pain, particularly in her left side, and shortness of breath, she and her husband went to the emergency room at Bethesda Naval Hospital where she was admitted and placed in the Coronary Care Unit to determine whether she was experiencing a heart attack or a myocardial infarction.

The doctors at Bethesda Naval Hospital discovered that Mrs. Kroll's heart was beating out of rhythm (atrial fibrillation), but they could find no evidence of any heart attack. They also discovered that in the weeks before admission her thyroid medicine (Synthroid) had been increased four-fold to suppress a nodule and that her potassium level was below normal. Both of these factors are known to contribute to atrial fibrillation. While in the hospital, Mrs. Kroll's potassium level was raised and her thyroid medicine was reduced to its prior level. Although the increased potassium would have immediate effect, the reduction in the thyroid medicine could take weeks to show effect.

The atrial fibrillation, which had occurred two or three times during the first hours after her admission to Bethesda Naval

Hospital, corrected itself and her heart resumed normal rhythm, *i.e.*, sinus rhythm, and remained in that state until her discharge on March 27, 1983.

At the time of discharge, the doctors at Bethesda Naval Hospital concluded that Mrs. Kroll's chest pain was muscular and not from the heart; that she had paroxysmal atrial fibrillation, which is an arrhythmia condition in which she went in and out of arrhythmia, as opposed to a chronic atrial fibrillation, which is a constant arrhythmia; that she had thyroid disease; and that she suffered from hypertension. They concluded that she tolerated her atrial fibrillation because they could observe no adverse symptoms when she went into arrhythmia. Her potassium level had been restored to within normal range, although on the low side, and her Synthroid medicine was reduced. She was directed to return to the Outpatient Clinic in ten days.

During her stay at Bethesda Naval Hospital from March 25 to March 27, a urine sample which had been taken disclosed an infection in the urinary tract. On March 27, 1983 (later on the same day on which she had been discharged) Mrs. Kroll returned to the emergency room to receive medicine for the urinary tract infection. It is not clear whether the hospital called her or she returned because of complaints. At the hospital she was placed on Septra, a sulfa drug, and returned home.

Mrs. Kroll became sick after taking the Septra, and she returned to the emergency room on March 31, complaining of nausea and vomiting. The emergency room doctor concluded that Mrs. Kroll was allergic to sulfa drugs, and changed her medicine from Septra to Ampicillin, which seemed to correct the problem.

On April 3, 1983 (about a week after her discharge) Mrs. Kroll became dizzy and weak and fell when she went to the bathroom. Mr. Kroll helped her to the bedroom and called the rescue squad. The medic that picked her up reported by telephone to the nearest hospital, Potomac Hospital in Virginia, that Mrs. Kroll had a possible "CVA," i.e., cerebral vascular accident (or stroke); that she had weakness to the left side and pain in the abdomen; and that her speech was slurred.

On reception at Potomac Hospital, Dr. Jose Colina, the emergency room physician, found no evidence of a CVA. He made no notes of slurred speech or focalized weakness. He diagnosed an arterio-schlerotic cardiovascular disease, atrial fibrillation, and possible jaundice. At the request of Mr. Kroll, Dr. Colina transferred her to Bethesda Naval Hospital, where her records were located, rather than admitting her to Potomac Hospital.

On her arrival at Bethesda Naval Hospital at 12:30 in the morning on April 4, Dr. C.W. Soika examined Mrs. Kroll and found that she was in atrial fibrillation and had abdominal pain. He found her atrial fibrillation rate at 108, which she was tolerating. He diagnosed her abdominal pain to be viral gastroenteritis and put her on clear liquids for one or two days. He discharged her from the emergency room and instructed her to return in 36 hours, or earlier if conditions worsened.

She returned home and rested. Mr. Kroll testified that he gave her medicines and put her to bed. After ten to twelve hours, however, when he was unable to arouse her, he called the rescue squad again. She was returned to Potomac Hospital on April 4, 1983. The doctors at Potomac found her to be in a coma and diagnosed a cerebral vascular accident (a stroke). Remaining in a coma, she was transferred to nearby Fairfax Hospital which had neurological services.

The doctors at Fairfax Hospital had significant difficulty in diagnosing Mrs. Kroll's condition; their task was not simplified by the many medicines she had been taking. Unexplained by any testimony was the presence of Placidyl, a tranquilizer, which was found in her blood in almost overdose levels, and a drug known as lidocaine, used to control the heart. According to the record, neither of those had been prescribed by either Bethesda Naval Hospital or Potomac Hospital.

The many diagnostic possibilities persisted several days after her stay. She was treated initially for an infection in the

brain, such as meningitis or encephalitis, because of the high white blood cell count. There was also some blood in the spinal fluid, suggesting a brain hemorrhage. An embolic stroke was considered, although it was not consistent with the high white blood cell count and the blood in the spine. Three days after Mrs. Kroll's admission, the diagnosis made by Dr. James F. Grim, the neurologist at Fairfax Hospital, was "hemorrhagic brain stem infarction—? embolic with clot in left post cerebral artery on angiogram." His final diagnosis, three weeks later, was "hemorrhagic brain stem infarction." While Dr. Grim was uncertain at any time about the diagnosis, at trial he testified with reasonable medical certainty that the stroke was caused by an embolism that probably was released by the heart. He was unable to explain the white blood cell count and the blood in the spinal fluid, although with respect to the latter he thought it could be attributed to his failed attempts at making a spinal tap.

Mrs. Kroll's condition worsened. She remained substantially in a coma until her death on July 20, 1988. While there were moments when she appeared to recognize her husband with a hand squeeze, and she responded once to a doctor to focus at him with her eyes, her only awareness was a week or so before her death when she seemed to make progress and was begun on therapy.

### III

■ Mr. Kroll contends that Bethesda Naval Hospital failed to conform to the standard of care in the treatment of Mrs. Kroll in two respects. He first contends that during her stay at Bethesda Naval Hospital during the period from March 25 to March 27, when Mrs. Kroll's atrial fibrillation was first observed, she should have been put on the drugs digoxin and quinidine, which are effective in controlling atrial fibrillation. Mr. Kroll presented evidence that atrial fibrillation increases the risk of an embolus or clot being developed in the heart, which could then circulate to the brain causing a stroke. He contends that this is what occurred on April 4, 1983.

Mr. Kroll's second contention is that Bethesda Naval Hospital should have admitted Mrs. Kroll on April 4, 1983 for observation and consultation when she was transferred from the emergency room at Potomac Hospital to the emergency room at Bethesda Naval Hospital, because she was in a condition of atrial fibrillation. Instead, Bethesda Naval Hospital sent her home, where she later suffered a stroke.

In response, the government contends that its treatment of Mrs. Kroll from March 25–27 conformed to the standard of care. It urges that digoxin and quinidine are toxic and potentially lethal drugs that are prescribed only when needed. The government urges that it is a judgment call whether these drugs should have been used and that in the circumstances they were properly rejected. Mrs. Kroll's atrial fibrillation was paroxysmal, *i.e.*, sometimes occurring, and when she was discharged on March 27, 1983, she was in a normal sinus rhythm. The government contends further that because of her return to sinus rhythm, the treatment selected by reducing the thyroid medicine and raising the potassium levels was the better course, even in hindsight.

With respect to the treatment on April 4, the government contends that Mrs. Kroll's only complaint was abdominal pain. Although she was also in atrial fibrillation at the time, it contends that she was tolerating the condition well. They urge that she just as well could have been treated as an outpatient.

The government also contends that there is no causal relationship between the alleged breach of a duty of care and the stroke that Mrs. Kroll suffered. The stroke was without warning and was not something that should have been treated in the absence of some indication for treatment.

The Court heard expert testimony on behalf of plaintiff from Dr. Robert H. Sellers, an internist and cardiologist and Dr. James F. Grim, a neurologist and the one who treated Mrs. Kroll. Expert testimony on behalf of the government was received

from Dr. Nicholas Fortuin, a cardiologist, and Dr. Thomas Price, a neurologist.

Based on the testimony of the various treating doctors as well as the opinions of the experts, the Court makes the following findings.

The treatment on March 25 through March 27, 1983 did not violate the standard of care for medical treatment. Indeed, the selected method of treatment, that of reducing the Synthroid medicine and increasing the potassium level, seemed to have been successful and the most conservative medically. Mrs. Kroll's arrythmia never returned after her initial hours in the hospital. The administration of digoxin and quinidine was not mandated by the standard of care. On the contrary, it would be administered with care, as a matter of discretion and judgment, when needed to restore an arrhythmic condition, usually when chronic. Because of the risks attendant to the administration of those drugs, and alternative treatments having apparently been successful, the Court cannot say that Mr. Kroll has satisfied his burden of proof in showing a violation of the standard of care.

■ Likewise, the Court concludes that the failure to admit Mrs. Kroll on April 4 did not violate the standard of care. Moreover, this failure has not been shown to have contributed to the cause of the stroke.

While the failure to keep Mrs. Kroll overnight might be criticized, nothing was pointed to that could have been done reasonably to anticipate a stroke or prevent its occurring. Indeed, no doctor testified for either party that a stroke could have been prevented with normally acceptable treatments on April 4 in the circumstances presented. While anticoagulants can be administered to any human being to lessen the possibility of a stroke, the administration of anticoagulants is a highly risky proposition that is not administered merely as a prophylactic.

Plaintiff urges that atrial fibrillation is known to increase the chances of an embolic issue and that an embolism probably caused Mrs. Kroll's stroke. Plaintiff argues that if the atrial fibrillation had been treated on April 4, Mrs. Kroll might still be alive. However, even if the drugs digoxin and quinidine had been administered at that time, it would have taken days for the drugs to develop their therapeutic level, and no one could say that the failure to begin administration of those drugs on April 4 caused Mrs. Kroll to develop an embolus later that day. More fundamentally, however, the plaintiff has failed to prove that an embolus did develop or that an embolus was the cause of stroke in this case. The medical evidence to the contrary showed that there was no reasonable certainty on the cause of stroke. Even plaintiff's doctor was unable to diagnose the cause of stroke at the time of treatment, although during trial he testified confidently that it was of the embolic kind. The defendant's doctors were very persuasive in this respect and pointed out that there could be no medical certainty as to the cause of stroke because of the conflicting symptoms. The Court finds the testimony of Dr. Fortuin and Dr. Price more persuasive on these points than the testimony of Dr. Grim. They pointed out that the medical history and the medical records could not support a finding with any medical certainty as to the cause of the stroke, conceding that an embolic stroke also could not be entirely eliminated. The uncertainty of a diagnosis is fully justified by the conflicting data and symptoms. For instance, blood in the spinal fluid is not consistent with an embolic stroke; the high level of white blood cells in the spinal fluid suggested stroke as the result of an infection, not from an embolus; the alleged location of the stroke (in the posterior interior cerebellar artery) would have required any embolus to make a right turn from the main artery, which would have been unusual in the experience of the experts.

The Court finds that the stroke that ultimately led to Mrs. Kroll's death was sudden and unanticipated. It was not shown to have been caused by any treatment rendered by the defendant or any lack of treatment. More important to the issues presented, however, the Court concludes that no showing was made that any treat-

 

ment or lack of treatment eliminated a substantial chance of survival. It cannot be urged, even in hindsight, that on April 4, when confronted with Mrs. Kroll's condition, a doctor should have treated her for a stroke that had not occurred. Only atrial fibrillation, of a paroxysmal type, was apparent, and the earlier selected treatment for this, (lowering Synthroid and increasing potassium), if not the better course, was at least an acceptable medical judgment in the circumstances. Even were the doctors to have changed the earlier selected treatment when they saw atrial fibrillation again on April 4, no evidence suggested that this would have lessened the possibility of the stroke on that day. The time when drugs would have become helpful was beyond the time when the stroke occurred.

The Court recognizes that the failure to admit Mrs. Kroll on April 4 at the Bethesda Naval Hospital was considered by Mr. Kroll as a casual response to her condition and did not appear as caring as was necessary to comfort her. It cannot be said, however, that the plaintiff has met the burden of showing (1) that it fell short of the standard of care applicable or (2) that any alleged violation of that standard caused the stroke.

Mrs. Kroll had a multiplicity of illnesses prior to her stroke, and the stroke, which was but one more, was not the result of any of the treatments for her other illnesses. The Court was and is enormously sympathetic to the family of Mrs. Kroll. However, in making decisions of this kind the Court must consider the rights of all parties and apply the applicable standards of law to the facts. For all the reasons given above, the Court concludes that the defendants are not liable to Mrs. Kroll or to the estate of Mrs. Kroll for any condition which she experienced.

Accordingly, for the reasons given, it is hereby ORDERED this 22nd day of February, 1989, that:

1. Judgment be entered in favor of the United States and against the plaintiff for costs;

2. The Clerk is directed to mail a copy of this Memorandum and Order to all counsel of record and to close this file.