902 F.2d 282
 Katherine B. FARWELL, Personal Representative of the Estate
of Brian J. Farwell, Deceased; Katherine B. Farwell,
Individually and as Widow of Brian J. Farwell, Deceased;
Katherine B. Farwell, Mother and Next Friend of Alan
Farwell, Luke Farwell and Neil Farwell, Minor Children of
Brian J. Farwell, Plaintiffs-Appellants,
v.
Chong H. UN, M.D.; Linwood W. Briggs, M.D., Defendants-Appellees.
Katherine B. FARWELL, Personal Representative of the Estate
of Brian J. Farwell, Deceased; Katherine B. Farwell,
Individually and as Widow of Brian J. Farwell, Deceased;
Katherine B. Farwell, Mother and Next Friend of Alan
Farwell, Luke Farwell and Neil Farwell, Minor Children of
Brian J. Farwell, Plaintiffs-Appellants,
v.
Chong H. UN, M.D.; Linwood W. Briggs, M.D., Defendants-Appellees.
 Nos. 89-2091, 89-2095.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 5, 1989.
Decided May 9, 1990.
As Amended May 23, 1990.
Rehearing and Rehearing In Banc Denied May 31, 1990.
As Amended July 2, 1990.
 
 George Woodson Shadoan (argued), Shadoan & Michael, Rockville, Md., for plaintiffs-appellants.
 Ronald Upton Shaw, Miles & Stockbridge, Baltimore, Md., argued for Briggs; Bonnie Jo Beavan, Goodell,
 DeVries, Leech & Gray, Baltimore, Md., argued for Un; Daniel R. Lanier, David M. Feitel, Miles & Stockbridge, Donald L. DeVries, Jr., Goodell, DeVries, Leech & Gray, Baltimore, Md., on brief.
 Before WIDENER, PHILLIPS and WILKINSON, Circuit Judges.
 PHILLIPS, Circuit Judge:
 
 
 1
 Appellant Katherine B. Farwell (Farwell) as personal representative of the estate of her deceased husband, Brian J. Farwell (decedent), and three of her children brought diversity wrongful death and survival actions against two physicians after their husband and father committed suicide. Dr. Linwood W. Briggs, a family practitioner, had treated decedent for five months before the suicide; Dr. Chong H. Un, a psychiatrist, saw decedent only once, the day before he committed suicide. The district court granted summary judgment for both defendants, ruling that under applicable state statutes the doctors could not have had decedent involuntarily committed to a hospital, hence breached no duty by failing to attempt to do so, and that the plaintiffs' forecast of evidence failed to establish that Dr. Briggs' care during the months preceding the suicide was the proximate cause of decedent's suicide. Though we do so on slightly different grounds, we affirm the judgment of the district court. We hold that, under controlling substantive law and on the undisputed facts of record, the defendant-physicians breached no duty of care owed their patient.
 
 
 2
 * Decedent, a Maryland resident,[1] suffered depression after he was fired from his job with Stauffer Chemical Company in November 1985. Dr. Briggs, a physician licensed and practicing in Maryland, but at the time of this action's commencement a citizen of Maine, diagnosed the depression and prescribed anti-depressant medication on decedent's first office visit in January 1986. Dr. Briggs also saw decedent in February (twice), March, and May of 1986. On June 1, decedent told his wife that he had attempted to hang himself. Farwell called Dr. Briggs on June 2, and Dr. Briggs saw decedent and Farwell that afternoon. Decedent and his wife agreed with Dr. Briggs that decedent should be voluntarily hospitalized that day, but after leaving the office they instead returned home. Dr. Briggs learned from the admissions office on June 3 that decedent had not entered the hospital. He called Farwell, who told him that decedent was feeling better. Dr. Briggs changed decedent's medication but did not attempt to schedule an appointment to see decedent or otherwise follow-up in the matter.
 
 
 3
 Decedent's mother-in-law arranged for him to see Dr. Un in his Delaware office on June 9. Dr. Un, a citizen of Delaware, licensed to practice both in that state and Maryland, spoke first to decedent individually, then to Farwell, and finally to the two together. Dr. Un did not believe that decedent was imminently suicidal and did not recommend involuntary hospitalization; instead, he recommended that decedent go to the Veterans Administration (V.A.) hospital in Perry Point, Maryland, for voluntary admission that day. Dr. Un then sent decedent back to see Dr. Briggs. Dr. Briggs testified that Dr. Un "said he was sending Mr. Farwell over to see me and I was to talk to him and convince him of the necessity for voluntary commitment," and that Dr. Un told him "that the patient was willing to go to the hospital, but he wanted me to add my opinion's weight to it." While in Dr. Briggs' office, decedent did agree to enter the V.A. hospital the next day. The next day, however, he instead drove to his home in Pennsylvania and committed suicide by hanging.
 
 
 4
 After the parties had waived the mandatory arbitration provided by Maryland law, Farwell filed this diversity action in federal district court in Maryland. She alleged that Dr. Briggs' care from January 1986 through June 9, 1986, and Dr. Un's care on June 9 was negligent and that the negligence of the two doctors was the proximate cause of her husband's death. The gravamen of the Farwells' complaint is that the defendants should have committed decedent involuntarily or at least taken steps to ensure that he would present at the hospital for voluntary admission. Both defendants moved for summary judgment, and the district court granted the motions on the parties' written submissions.
 
 
 5
 The court first ruled that under Maryland's choice of law rules, it would apply the law of the place where the alleged medical negligence occurred, that is, the law of Maryland (Dr. Briggs) and the law of Delaware (Dr. Un), rather than the law of Pennsylvania where death occurred. The court recognized that Maryland follows the traditional doctrine of lex loci delicti for choice of law questions in tort actions, but because other states have ruled that suicide constitutes an intervening and superseding cause relieving the treating physician from liability, and because "common sense" mandated that a physician's actions be evaluated under the law of the state in which he practices, the court applied the substantive law of Maryland to Dr. Briggs and the law of Delaware to Dr. Un.
 
 
 6
 The principal factual contention involved decedent's willingness voluntarily to enter the V.A. hospital for treatment. In the summary judgment record before the district court were the depositions of Farwell, Dr. Briggs, and several experts.[2] Farwell deposed regarding the office visit with Dr. Un:
 
 
 7
 Q. What happened while you were talking to Dr. [Un] by yourself?
 
 
 8
 * * * * * *
 
 
 9
 A. I just wanted Brian to be put in the hospital for treatment and evaluation. And I felt that he would not go by himself, he had shown that the week before. And I felt that he should be involuntarily committed to be treated and helped. And I put this--I said this to Doctor Un, and Doctor Un said that he would not involuntarily commit Brian which was a great shock to me.
 
 
 10
 * * * * * *
 
 
 11
 Q. Why did you want your husband involuntarily admitted at the time?A. Because he would not go voluntarily, he refused. And I really felt he needed help more than he was getting.
 
 
 12
 She also testified, however, that an agreement was reached at Dr. Un's office to have decedent go to the V.A. hospital at Perry Point, Maryland. Farwell further admitted that decedent told Dr. Briggs at his office the same day he saw Dr. Un that he would go to the hospital. She attempted to undermine the relevance of decedent's agreement at Dr. Briggs' office through expert opinion evidence that Dr. Briggs should have known not to believe decedent because just one week earlier he had indicated he would enter the hospital voluntarily and did not present for admission. Critically, however, the experts agreed that decedent was competent and not psychotic at the time he agreed to voluntary admission.
 
 
 13
 The district court found that there was "no genuine dispute" that decedent agreed to voluntary hospitalization. The court discounted Farwell's deposition testimony that her husband had refused, while in Dr. Un's office, to accept voluntary admission. The court noted decedent's agreement in Dr. Briggs' office, the acknowledged choice of the V.A. hospital in Dr. Un's office, the separate conversation between decedent and Dr. Un, and Dr. Un's referral to Dr. Briggs so that Dr. Briggs could confirm the hospitalization. This ruling was the linchpin of the court's principal ground for granting summary judgment, because it found that under the relevant statutes in Maryland and Delaware, decedent could not be involuntarily committed if he voluntarily agreed to be hospitalized. See Md. [Health-Gen.] Code Ann. Sec. 10-617 (1990) (hospital may not involuntarily admit individual unless, inter alia, "[t]he individual is unable or unwilling to be admitted voluntarily"); Del.Code Ann. title 16, Sec. 5003 (1988) (psychiatrist's certification required for involuntary admission "shall state that such person is not willing to accept hospital care and treatment on a voluntary basis or that he is incapable of voluntarily consenting to such care and treatment"). After this legal ruling, the court assumed that it need not consider expert testimony from Farwell's witnesses that the standard of care required the defendants to seek involuntary commitment of decedent.
 
 
 14
 The court also held that the plaintiffs' forecast of evidence failed to permit the inference that Dr. Briggs' care during the January-May 1986 period was the proximate cause of decedent's suicide. In plaintiffs' answers to interrogatories, six experts were listed as having the opinion that Dr. Briggs failed to meet the standard of care and that this failure was the proximate cause of decedent's suicide, but no dates were specified. Three of plaintiffs' experts, in depositions before the court, opined that Dr. Briggs did not meet the standard of care, but again treatment during the January-May period was not specified as the proximate cause of decedent's suicide.
 
 
 15
 The district court did not have before it the deposition of a fourth expert, Dr. Alan Berman, who seemed to opine that Dr. Briggs' substandard care resulted at least in the June 1 suicide attempt.
 
 
 16
 Q. Let me ask you to assume that Mr. Farwell was treated as you would have him treated, in other words, that the treatment was adequate at any point in time from January until June of 1986. Can you give me a percentage as to the likelihood that he would not have committed suicide at any point in his life?
 
 
 17
 A. The percentage would be extremely high, roughly in the 85 to 90 to 95 percent range. Based on data with regard to--if you are talking after an attempt had been made with regard to the percentage of patients with major depression who make a suicide attempt or completion, we are talking about perhaps 98 percent, 99 percent of patients with this disorder do not go on to suicide and perhaps that's even too conservative an estimate.
 
 
 18
 * * * * * *
 
 
 19
 Q. It is your testimony that had adequate treatment been given during the first two phases that you identified, then Mr. Farwell would not have even attempted suicide on June 1; is that right?A. Yes, that's correct.
 
 
 20
 Dr. Berman's deposition was not before the district court when it granted summary judgment, and that court denied plaintiffs' subsequent motion to supplement the record on appeal with the deposition.[3]
 
 
 21
 On appeal, Farwell concedes that the district court properly applied the substantive law of the states of the respective defendants' practice and challenged conduct but contends that it erred in finding that there was no genuine issue as to whether decedent was willing voluntarily to accept admission to the hospital. She also argues that with or without Dr. Berman's deposition, the evidence she forecast was sufficient to support a finding that Dr. Briggs' care from January-May 1986 was the proximate cause of her husband's death. Dr. Briggs agrees that Maryland law applies and contends that the district court properly ruled that there was no genuine dispute that decedent agreed to voluntary admission. Dr. Un argues primarily that Pennsylvania law applies and that under that state's law he breached no duty to decedent. We address the choice of law question first, and then turn to the substantive questions.
 
 II
 
 22
 Maryland choice of law rules control, Klaxon Co. v. Stentor Elec. Mfg., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), and from this arises a minor dispute between the parties as to the correct choice of substantive law. The choices contended for are between the law of Pennsylvania, where the suicide occurred, and the law of Maryland and Delaware respectively, where the two doctors' separate treatment and counselling occurred and under whose regulatory laws they severally practiced. The dispute can be considered minor because only Dr. Un, seeing in Pennsylvania law an assumed advantage, contends for that state's law as providing the substantive rules of decision.[4] Both the plaintiffs and Dr. Briggs agree that the laws of the respective states of licensure and conduct should control.
 
 
 23
 The matter is made disputable at all only by the fact that Maryland, against what may be the general trend of latter times toward "significant relationships" analysis, appears rather steadfastly to have adhered to lex loci as the ordering principle in tort cases. See, e.g., Rhee v. Combined Enters., 536 A.2d 1197, 1198-1200 (Md.Ct.Spec.App.), cert. granted, 313 Md. 9, 542 A.2d 845 (1988). Within that general principle there of course remains the persistent notion that the locus of a tort for choice of law purposes is that where the last act required to complete it occurred. See Johnson v. Oroweat Foods Co., 785 F.2d 503, 510-11 (4th Cir.1986) (applying Maryland conflicts rule). Here, that locus is of course Pennsylvania, where the suicide occurred, and it is on this basis that Dr. Un, alone of the parties, contends for Pennsylvania law.
 
 
 24
 As indicated, the district court rejected this contention, and decided that as a matter of "common sense" Maryland would apply its own substantive law to the claim against Dr. Briggs and that of Delaware to the claim against Dr. Un, notwithstanding its basic commitment to lex loci. We agree with this ultimate choice of law decision.
 
 
 25
 In the absence of any direct Maryland judicial authority on the specific facts of this case, two factors persuade us that the district judge, himself of Maryland, had it right. First off, there is indeed a "common sense" exception to the classic lex loci rule that points this way and that we assume Maryland courts would apply. As formulated in the First Restatement, when lex loci was considered still the prevailing rule in tort:
 
 
 26
 Where by the law of the place of wrong, the liability-creating character of the actor's conduct depends upon the application of a standard of care, and such standard has been defined in particular situations by statute or judicial decision of the law of the place of the actor's conduct, such application of the standard will be made by the forum.
 
 
 27
 Restatement of Conflict of Laws Sec. 380(2) (1934).
 
 
 28
 Here, as has been indicated, statutes of both Maryland and Delaware, the states wherein occurred the wrongful conduct charged respectively to Drs. Briggs and Un, define in critical ways the duty of physicians to psychiatric patients in the context of claims such as those here.
 
 
 29
 Secondly, and more critically, Maryland's wrongful death statute speaks directly to the choice of law rule to be applied in such cases when "the wrongful act occurred in another state." Md. [Cts. & Jud.Proc.] Code Ann. Sec. 3-903(a) (1989). In such cases, "a Maryland Court shall apply the substantive law of that jurisdiction." Id. This of course speaks directly to the claim against Dr. Un by directing application of the law of Delaware where occurred the "wrongful act" charged to him. It does not speak directly to the claim against Dr. Briggs, for the "wrongful act" charged to him occurred in Maryland and not "in another state." But by the strongest implication it points to Maryland as the proper source of law for deciding the Briggs claim. This is because the Maryland statute specifically identifies the locus of the "wrongful act" rather than the locus of death as the critical choice of law determinant in wrongful death actions with multi-state connections. In this respect, this statute makes specific for wrongful death cases the "place-of-wrong's-standard-of-care" exception to the classic lex loci rule, thereby displacing in this context the "last-act-to-complete-the-tort" aspect of that rule.[5]
 
 III
 
 30
 In reviewing a grant of summary judgment, we apply the same summary judgment standards applicable in the district court, but are not bound by the theories upon which that court may have relied. See 10 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure: Civil Sec. 2716 (1983). Our review is therefore essentially a plenary review on the summary judgment record before the district court.
 
 
 31
 As indicated, Farwell essentially has advanced two separate factual theories of negligence against the two defendants. Primarily she claims that once decedent had attempted suicide on June 1, both defendants, knowing of this, were then negligent in not either involuntarily committing the decedent or at least taking steps to ensure that he would voluntarily commit in time to prevent his suicide on June 10. She also apparently claims that Dr. Briggs' negligence in treatment before the time of the attempted suicide on June 1 was, additionally, a proximate cause of the eventual suicide, hence a separate basis for finding Dr. Briggs liable. Because the two theories require somewhat different analyses, we treat them separately and in the order stated.
 
 
 32
 * In assessing the theory that each of the defendants was negligent in not either involuntarily committing decedent or somehow ensuring his voluntary commitment after learning of the June 1 suicide attempt, the district court focussed on the threshold question of the duty of care owed by each to decedent under the circumstances confronting them. Doing so, the court concluded that the defendants' respective duties of care were effectively defined by the statutes of Maryland and Delaware which control the involuntary commitment of persons for mental disorder or disease. Noting that each statute requires as a condition to involuntary commitment that the person be either "unable" or "unwilling" to commit voluntarily, the district court essentially concluded that these statutes completely defined the two defendants' duties in the relevant respect. Because it was undisputed on the summary judgment record that at the critical times decedent, being then competent, expressed to both defendants his willingness to commit voluntarily, the defendants could not have committed him involuntarily, hence obviously had no duty to attempt to do so. No duty of care having been breached, that resolved the matter.
 
 
 33
 The district court rightly focused on the duty of care as the possibly dispositive issue on this particular theory of negligence. Maryland and Delaware of course both apply traditional tort principles in medical malpractice cases: plaintiff must prove that defendant owed plaintiff a duty, breached that duty, and that the breach proximately caused the claimed injury. See, e.g., Suburban Hosp. Ass'n v. Mewhinney, 230 Md. 480, 482, 187 A.2d 671, 673 (1963); Naidu v. Laird, 539 A.2d 1064, 1072 (Del.1988). The existence and scope of duty is of course a threshold issue in medical malpractice analysis as in negligence actions generally, and the question in any context whether and in what form any legal duty exists is a question of law for the courts, see W. Keeton, Prosser & Keeton on Torts Sec. 37, at 236 (5th ed. 1984), to be decided on the specific facts of the case. See id. (question is "whether, upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other"); see also Jacques v. First Nat'l Bank, 307 Md. 527, 515 A.2d 756, 758-61 (1986) (identifying factors determining when court will impose tort duty); Naidu, 539 A.2d at 1070 ("duty must be formulated in each particular case in light of its peculiar facts").
 
 
 34
 While the district court properly identified the existence and scope of duty as a threshold, potentially dispositive issue here, we think it may have decided that issue against plaintiffs on too narrow a view of the duty owed. The duty cannot be thought completely defined by the statutes controlling involuntary commitments in the two states. In imposing the negative duty not to commit involuntarily a competent patient who is willing and able to commit voluntarily, these statutes do not in terms or by necessary implication purport by this to ordain the outer bounds of the affirmative duty of care owed patients such as decedent here under any and all circumstances. Maryland and Delaware law, in line with principles generally applied, define a physician's duty to his patient as that of exercising the care and skill of a reasonably competent practitioner under the circumstances presented by particular patients' conditions. See, e.g., Shilkret v. Annapolis Emergency Hosp. Ass'n, 276 Md. 187, 349 A.2d 245, 253 (1975); Naidu, 539 A.2d at 1072. Obviously this duty could run wider in a particular case than the duty of simple compliance with the negative duty not to commit involuntarily that is imposed by the relevant involuntary commitment statutes. The Delaware court, for example, has specifically so held under its law. See Naidu, 539 A.2d at 1072 ("The Delaware statutes concerning the care of the mentally ill do not fully define all the duties of mental health professionals."); see also Restatement (Second) of Torts Sec. 288 (1965) (compliance with statutory duty will not prevent finding of negligence where reasonable person would take further precautions); cf. Jacques, 515 A.2d at 759 (duty imposed by statute does not necessarily define duty enforceable in tort).
 
 
 35
 The question therefore becomes the scope of any legal duty owed by physicians to prevent their mental patients with known or suspected suicidal tendencies from committing suicide where state law actually prevents their seeking to protect those patients by having them involuntarily committed. Plaintiffs' contention apparently is that in those circumstances physicians have an unbounded duty to take whatever other action is humanly possible to ensure that the patient will actually follow through on a competently expressed willingness and intention to commit voluntarily.
 
 
 36
 Obviously, in a particular case, such a stringent duty could only be discharged by a physician's assuming actual physical custody of the patient or, at the very least, mounting such continuous and close physical surveillance that effective physical intervention could occur at any time it thereafter seemed necessary. Merely to point this out is to indicate the practical impossibility, hence unfairness, of imposing so stringent a duty of care. We are satisfied that neither of the states whose law controls would do so. While for purposes of this case we may assume that each would impose upon physicians some duty of inquiry after a competent patient's expression of willingness to commit voluntarily, we think it could only be a much more modest and realistic one.[6] Indeed, we think the limits of any such duty are implied, though not wholly defined, by the constraints imposed upon physicians by the involuntary commitment statutes. These bespeak legislative concerns, as matters of the relevant states' public policies, in the rights of competent patients not to be subjected to paternalistic actions by their physicians, no matter how well-meaning and professionally warranted, that might intrude on their patients' dignity and privacy interests. State law, based upon a deliberate balancing of the interests at stake, compels physicians in this context to defer to their patients' privacy and dignitary interests in ways that obviously may run counter to the physician's professional judgment about a patient's "best interests" and indeed may involve a known degree of risk to the patient's well-being. In the climate of physician-patient legal relationships that such legislation deliberately creates, we think a physician could be held to no further duty than to make responsible inquiries to assess the status of a patient who has expressed a willingness and has the apparent ability to commit voluntarily.
 
 
 37
 Obviously, the question whether any such duty of inquiry was breached in a particular case could present genuine issues of material fact precluding summary judgment. But we conclude that this is not such a case. We hold instead that as a matter of law on the undisputed facts of record, the only duty of care that could have been owed decedent by either Dr. Briggs or Dr. Un during and following their respective last contacts with him on June 9, 1986, was the duty of inquiry above discussed, and that neither breached any such duty. The critical facts not genuinely in issue are these: at the time of his last contact with each physician, decedent was competent and not in a psychotic state; at each of those times, first in Dr. Un's office on June 9, and later on that same day in Dr. Briggs' office, decedent manifested to each physician, based upon the specific advice of each, an intention to commit voluntarily the next day to the V.A. Hospital in Perry Point, Maryland; on both occasions, decedent was accompanied by his wife who the two physicians knew was aware of both their advice and her husband's indication of intention to follow it; the next day, without any further communication between decedent or his family and the physicians, decedent left his Maryland residence and drove to Pennsylvania where he committed suicide.
 
 
 38
 On these facts, given the short lapse of time, the competently given manifestations of decedent's intention, and the direct, obviously devoted attendance of his wife, these two physicians could only be found to have breached any duty of care if that duty had been to assume physical custody or continuous surveillance over the decedent. As we have held, we are satisfied that no such duty would be imposed under the laws controlling in this diversity action. That being so, neither of the physicians could be found liable for their conduct during and after their respective last contacts with decedent on June 9, 1986, and the district court did not err in rejecting this theory of liability.
 
 B
 
 39
 We turn now to Farwell's theory that Dr. Briggs' care during the January-May 1986 period was negligent and proximately caused her husband's suicide on June 10, 1986. The district court held that plaintiffs had presented no evidence that Dr. Briggs' care during this period was the proximate cause of decedent's suicide. Dr. Berman's deposition was not before the district court, and might be read, in the light most favorable to appellants, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), as suggesting that Dr. Briggs' care prior to the June 1 suicide attempt was a cause-in-fact of the suicide on June 10, as undoubtedly were many other factual causes meeting the modest "but for" test in relation to the ultimate tragedy. But cause-in-fact, though required, is not of course the ultimate question, that being legal or proximate causation--whether such a cause-in-fact should be treated by the law as sufficiently "substantial" to warrant imposing liability upon the actor. See generally Restatement (Second) of Torts Secs. 430-433; Prosser and Keeton on Torts Sec. 41 (5th ed. 1984). As to that, even assuming that the Berman deposition, along with others, raised an inference of causation-in-fact, we hold that as a matter of law Dr. Briggs' care before the June 1 suicide attempt could not properly be held the legal cause of decedent's suicide on June 10.
 
 
 40
 If the facts bearing upon an issue of legal cause are not in dispute, that issue is for the court. In this case, Farwell seeks to recover for her husband's suicide on June 10, not for any injury he suffered in the June 1 suicide attempt. The material facts after decedent's June 1 attempt are not in dispute. Once he learned that his patient had attempted suicide, Dr. Briggs recommended, and decedent agreed on both June 2 and June 9, that decedent would enter the hospital for treatment. We have held that Dr. Briggs had no possible duty beyond making reasonable follow-up inquiries once decedent agreed to accept voluntary admission and that this duty was not breached. Even assuming that Dr. Briggs' care was negligent prior to the June 1 suicide attempt, the critical change in circumstances with the suicide attempt and Dr. Briggs' legally adequate response when his patient agreed to voluntary hospitalization made the tenuous cause-in-fact link to the suicide on June 10 not legally sufficient to impose liability. Cf. Restatement (Second) of Torts Sec. 452(2) (1965) (duty shifted as circumstances change).
 
 IV
 
 41
 The defendants were entitled to summary judgment in this case. There is no genuine dispute that plaintiffs' decedent agreed to accept voluntary admission to the hospital. Decedent was competent to give such consent to voluntary hospitalization, and on these facts, defendants breached no duty by counseling that decedent agree to voluntary hospitalization and accepting his agreement to that course of treatment. The judgment of the district court granting defendants summary judgment is therefore affirmed.
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 All of the plaintiffs in this action, Mrs. Farwell and the Farwell children, are also residents of Maryland
 
 
 [2]
 Dr. Un was deposed during pretrial discovery, but only one page of that deposition was before the court in the summary judgment record. The deposition testimony before the court did not encompass the question of decedent's willingness voluntarily to enter the hospital
 
 
 [3]
 Farwell has moved this court to supplement the record on appeal with Dr. Berman's deposition. For reasons that will appear, we find it unnecessary to rule on the motion
 
 
 [4]
 In view of our disposition of the choice of law question, we need express no opinion on whether Pennsylvania law would indeed provide any more favorable a rule to Dr. Un than that we apply
 
 
 [5]
 We are aware that two earlier district court decisions interpreting a predecessor Maryland choice-of-law provision and applying it to wrongful death actions with multi-state connections may appear to have reached conclusions at odds with that reached by the district court here. See Uppgren v. Executive Aviation Servs., 326 F.Supp. 709, 711-13 (D.Md.1971) (applying Minnesota law where allegedly negligent act in Maryland caused injury and death in Minnesota; predecessor statute [incompletely quoted in opinion] analyzed only for possible Maryland public policy constraints on foreign law application; no reference made to statute's specification of "wrongful act" as choice of law determinant); Debbis v. Hertz Corp., 269 F.Supp. 671, 673-75 & n. 1 (D.Md.1967) (applying West Virginia law where allegedly negligent act in Virginia caused injury in West Virginia and ensuing death in Maryland; predecessor statute relied on as precluding "significant relationship" analysis, but "weight of authority" rather than express statutory specification of "wrongful act" relied on for choice of West Virginia rather than Virginia law; implications of statutory "wrongful act" direction not addressed)
 We can only say of these earlier decisions that neither involved the exact factual pattern of the instant case; that they dealt with a predecessor statute which may not have appeared so specifically to have directed application of the law of the place of "wrongful act"; and that to the extent they may conflict with the result reached by the district court here, we think the latter result is the one dictated by the current statute.
 
 
 [6]
 We deliberately put this in terms of the uttermost duty that we think controlling law would possibly impose in the circumstances. In view of our disposition of the issue, we may proceed on such an assumption without purporting authoritatively to "find" such a duty under controlling state law. We note in this connection the existence of a considerable body of state law which would apparently not establish even this much of an affirmative duty with respect to competent patients being treated on an outpatient basis. See, e.g., Paddock v. Chacko, 522 So.2d 410 (Fla.Dist.Ct.App.1988) (no duty of custodial care and supervision); see also King v. Smith, 539 So.2d 262, 264 (Ala.1989) (no breach of duty in failing to prevent suicide and criminal conduct of outpatient)
 And we note that the cases upon which Farwell relies for the existence of duty approximating that assumed arguendo here all involve mental patients in custodial care in hospitals or other facilities. See Cowan v. Doering, 215 N.J.Super. 484, 522 A.2d 444 (1987), aff'd, 111 N.J. 451, 545 A.2d 159 (1988); Meier v. Ross Gen. Hosp., 69 Cal.2d 420, 445 P.2d 519, 71 Cal.Rptr. 903 (1968); State, Use of Shockey v. Washington Sanitarium & Hosp., 223 Md. 554, 165 A.2d 764, 765-66 (1960). In such circumstances, a more stringent duty of care might obviously be thought appropriate.