19 F.3d 1429
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
MILNER HOTELS, INCORPORATED, a Kentucky corporation
authorized to do business in the State of West
Virginia, Plaintiff-Appellant,
v.
NORFOLK AND WESTERN RAILWAY COMPANY, a Virginia corporation
authorized to do business in the State of West
Virginia, Defendant-Appellee,
and
NORFOLK SOUTHERN CORPORATION, its parent company, Defendant.
 No. 93-1774.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 8, 1994.
Decided March 31, 1994.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Bluefield. David A. Faber, District Judge. (CA-91-1078-1)
 Argued John W. Feuchtenberger, Stone, McGhee, Feuchtenberger & Barringer, Bluefield, WV, for appellant.
 Wade Thomas Watson, Sanders, Watson & White, Bluefield, WV, for appellee.
 S.D.W.Va.
 AFFIRMED.
 Before HALL, HAMILTON, and MICHAEL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Milner Hotels, Inc., appeals the district court's grant of summary judgment to Norfolk and Western Railway Co. (N & W) in Milner's diversity action for breach of contract.[1] We affirm.
 
 I.
 
 2
 In 1977, N & W sought to procure a consistent source of food and lodging for its transient train crews passing through Bluefield, West Virginia. It entered into a written contract with the Milner-Matz Hotel, located directly across the street from the N & W railway yard in Bluefield. Under the terms of the contract, Milner was obligated to reserve a minimum of sixty rooms each day for the railroad employees, and to provide the crews with meals twenty-four hours a day. Clauses 1(d) and 1(e) specifically required Milner to "maintain[ ] at all times good, clean and sanitary conditions throughout the ... hotel," and "observe[ ] and comply[ ] with all local[,] state or federal laws and regulations pertaining to [its] operation." The parties renewed the contract annually for the next thirteen years, with little change save for periodic increases in the room rate. By 1991, Milner's staff housed and fed N & W crews to the virtual exclusion of the general public.
 
 
 3
 On March 10, 1991, a fire broke out on the second floor of the hotel. Damage from the fire was contained to one or two rooms on the floor. The lobby and other areas were slightly damaged by water, however, and cleanup specialists were called in to remove the smoky odor that had permeated throughout. N & W arranged for its crews to be housed elsewhere during the cleanup, which was completed in a few days.
 
 
 4
 In the interim, N & W's crews complained to management about the general condition of the hotel. N & W reacted to the fire and the complaints by informing Milner that the hotel would have to be inspected before the railroad would allow its employees to return. Milner agreed to the inspection, which occurred on March 15. The nine-member inspection team was comprised of representatives of both Milner and N & W, along with the local fire chief.
 
 
 5
 The inspection revealed some safety concerns. There were numerous fire code violations, including misused and overburdened extension cords, missing receptacle plates, taped wire junctions, and a general absence of conduit. In addition, a second floor storage room contained crumbling floor tile, of which one of N & W's representatives took samples and advised that the flooring be sealed or removed by an asbestos contractor. A similar situation existed in the laundry room. Upon inspecting the boiler room in the hotel's basement, the same N & W representative noted the presence of "severely deteriorated asbestos insulation in significant quantities."
 
 
 6
 Following the inspection, N & W told Milner that repairs would have to be made before N & W would authorize the return of its crews. Milner solicited repair bids. One contractor submitted a bid estimating that it would cost $7,000-$9,000 to upgrade the hotel's electrical system; however, a second contractor submitted a bid of approximately $85,000. Milner obtained two bids from a single vendor, totalling about $14,000, to remove asbestos pipe insulation from the basement, adjoining mechanical room, and fifth floor hallway.
 
 
 7
 Prior to accepting any bids, Milner sought assurances from N & W that its train crews would return upon completion of the repairs. N & W refused to give such assurances, instead notifying Milner by letter of April 9, 1991, that it was terminating the contract because of the "serious safety defects" disclosed by the inspection.[2] Upon receiving the letter on April 11, Milner proceeded to sell the hotel and its contents at an auction held just fifteen days later.
 
 
 8
 Milner filed suit in state court in September, 1991; N & W removed the action to federal court. Milner's complaint alleged $145,000 in compensatory damages for loss of lodging and restaurant revenues from March 11, 1991 (the date N & W removed its employees from the hotel), through May 10, 1991 (thirty days following Milner's receipt of N & W's termination letter, see note 2,supra ).[3] The district court granted N & W's motion for summary judgment on May 20, 1993; Milner appeals.
 
 II.
 
 9
 Our review of the district court's grant of summary judgment is de novo. Farwell v. Un, 902 F.2d 282, 287 (4th Cir.1990). Fed.R.Civ.P. 56(c) provides that summary judgment shall be "rendered forthwith" if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.
 
 
 10
 Milner admits in Paragraph Seven of its complaint that the irregularities in the hotel electrical system, revealed by the March 15 inspection, were violations of the city fire code. While Milner disputes the presence of friable asbestos in its hotel, its solicitation and receipt of a $14,000 bid for asbestos removal renders such a position untenable. Cf. Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir.1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct"). Because there is, then, no genuine issue of material fact, Milner can only prevail on appeal if neither the fire code violations nor the presence of asbestos constituted "defaults" that Milner was required to cure under Clause 10 of its contract with N & W, see note 2 supra.
 
 
 11
 Milner contends that the fire code violations and the asbestos situation were, at most, technical breaches of its agreement to maintain the hotel in good condition and to observe all applicable laws and regulations. We disagree. Disregarding for the moment whether the hotel's air had become contaminated by asbestos, we easily conclude that the abundant fire code violations were manifestations of a problem of sufficient gravity to warrant immediate correction. Regardless of whether the violations, either individually or collectively, represented "serious safety defects," as alleged by N & W, Milner cannot credibly argue that it could simply ignore them and yet comply with its obligations under the contract.[4]
 
 
 12
 Moreover, West Virginia law prevents a party who first breaches a mutual and dependent contract from recovering damages attribut able to a subsequent breach by the other party. See Teller v. McCoy, 253 S.E.2d 114, 126 (W. Va.1978) (citing Franklin v. Pence, 36 S.E.2d 505, 508 (W. Va.1945)). Thus, although N & W, as the party moving for summary judgment on the basis of the theory enunciated in Teller, was permitted by subsection (c) of Rule 56 to rest upon the record as it existed, see Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986), Milner was required by subsection (e) to affirmatively show, either by supplemental affidavits or by reference to specific portions of the record, that it had not committed a material breach of the contract which would preclude it from recovery. See id. at 324.
 
 
 13
 Milner made no such showing in response to N & W's motion for summary judgment. In the absence of contrary evidence, we believe that the record clearly indicates that the contract was terminated as the result of Milner's default, that the termination was effective as of March 15, 1991 (the date that Milner was put on notice of its default), see note 2, supra, and that N & W is not liable for any breach of contract alleged to have occurred after that date. As a result, N & W is entitled to summary judgment in this matter.
 
 
 14
 The judgment of the district court is affirmed.
 
 
 15
 AFFIRMED.
 
 
 
 [1]
 By agreement of the parties, N & W's parent corporation, Norfolk Southern Corp., was dismissed from this action on September 30, 1992
 
 
 [2]
 Clause 10 of the agreement allowed either party to terminate the contract for any reason upon thirty days written notice. The same clause also provided that the contract could be terminated at the option of the nonoffending party in the event of "any default by either party hereto in the performance of its obligations hereunder which is not cured within 30 days of receipt of notice thereof...." Because the parties could, at any time, unilaterally limit their prospective obligations under the contract to thirty days, the only reasonable reading of the default language is that the parties intended a termination arising from an uncured default to relate back to the date that the defaulting party received notice thereof
 
 
 [3]
 In addition, Milner originally sought consequential damages as a result of allegedly being forced to sell the hotel and its contents below market value. The district court held that N & W had properly terminated its agreement with Milner and, therefore, could not be held liable for consequential damages. Milner does not challenge this holding on appeal
 
 
 [4]
 Interestingly, Milner's attempt on appeal to portray its alleged breaches as immaterial seems to be inconsistent with its actions immediately following the inspection. Not only did it solicit bids to upgrade the hotel's electrical system and remove the asbestos, but apparently told at least one of the potential bidders on the electrical project, Allied Refrigeration, that the work had to be completed within four weeks. In its bid, Allied noted that "it is impossible to guarantee that this work can be completed in the four weeks aloted [sic]." The only reason that we can ascertain for such a time restriction is that Milner considered the fire code violations to be a serious enough breach of the contract as to constitute a default under Clause 10 if not corrected within thirty days