**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RICHMAN ENTERPRISES, LIMITED;
FABRIC RESOURCES INTERNATIONAL,
LIMITED,
Plaintiffs-Appellants,

v.

R. B. PAMPLIN, in his capacity as
Trustee of the R. B. Pamplin
Corporation and Subsidiaries
Pension Plan (previously known as
the Mount Vernon Mills,
Incorporated Pension Plan); MOUNT          No. 95-1142
VERNON MILLS, INCORPORATED
PENSION PLAN, in its capacity as
Administrator of the R. B. Pamplin
Corporation and Subsidiaries
Pension Plan,
Defendants-Appellees,

and

R. B. PAMPLIN CORPORATION AND
SUBSIDIARIES PENSION PLAN,
Defendant.

RICHMAN ENTERPRISES, LIMITED;
FABRIC RESOURCES INTERNATIONAL,
LIMITED,
Plaintiffs-Appellees,

v.

R. B. PAMPLIN, in his capacity as
Trustee of the R. B. Pamplin
Corporation and Subsidiaries
Pension Plan (previously known as
the Mount Vernon Mills,
Incorporated Pension Plan); MOUNT                    No. 95-1216
VERNON MILLS, INCORPORATED
PENSION PLAN, in its capacity as
Administrator of the R. B. Pamplin
Corporation and Subsidiaries
Pension Plan,
Defendants-Appellants,

and

R. B. PAMPLIN CORPORATION AND
SUBSIDIARIES PENSION PLAN,
Defendant.

Appeals from the United States District Court
for the District of South Carolina, at Anderson.
G. Ross Anderson, Jr., District Judge.
(CA-93-3356)

Argued: December 4, 1995

Decided: March 19, 1996

Before MURNAGHAN and MICHAEL, Circuit Judges, and
MICHAEL, Senior United States District Judge for the Western
District of Virginia, sitting by designation.

2

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Howard Jay Schwartz, PORZIO, BROMBERG & NEW-MAN, Morristown, New Jersey, for Appellants. James Henry Watson, Jr., LEATHERWOOD, WALKER, TODD & MANN, Greenville, South Carolina, for Appellees. **ON BRIEF:** Diane Mulligan Siana, PORZIO, BROMBERG & NEWMAN, Morristown, New Jersey, for Appellants. Michael J. Giese, Robert D. Moseley, Jr., LEATHERWOOD, WALKER, TODD & MANN, Greenville, South Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This matter comes before the court upon the appeal of an Order by the United States District Court for the District of South Carolina, Anderson Division, Judge G. Ross Anderson, Jr., finding that the appellants were not entitled to recover damages for an alleged breach of contract where the terms of a contract provide that if the appellees fail to fulfill certain contractual obligations, then the remedial provisions of the contract limit the appellants either to declare the contract null and void or to proceed to closing and sue for damages, and the appellants did not proceed to closing. We agree with the district court.

I.

The appellant, Fabric Resources International, Ltd. ("FRI"), is a textile manufacturer[1] with manufacturing facilities located in New

_____

[1] FRI manufactures greige -- a raw silk -- and other finished goods. The court assumes that FRI is either owned by, controlled by, or affili-

3

Jersey and Rock Hill, South Carolina. In 1990, FRI decided to expand its operations and began to search for another facility in South Carolina. FRI was shown property located in Whitmire, South Carolina (the "Property"). The Property consisted of a one-story facility which had been used in the manufacturing sector for most of its thirty-year existence. The Property was then owned by the appellee, Mount Vernon Mills, Incorporated ("Mount Vernon"). [2] Mount Vernon provided FRI with a brochure outlining the characteristics and condition of the Property. FRI claims that the brochure failed to identify Cone Mills' ownership of the Property and that the brochure expressly stated: "ENVIRONMENTAL CONSIDERATIONS -- NO KNOWN OR EXPECTED ENVIRONMENTAL HAZARDS."

On February 14, 1991, the parties executed a "Contract of Purchase and Sale" (the "Contract") to govern FRI's purchase of the Property. Because the court's analysis turns on the language of the contractual provisions at issue, the court will devote considerable space in setting forth the relevant provisions:

> 1.5: Closing. Consummation of this Contract, hereinafter referred to as the "Closing," shall be held on April 1, 1991 . . . .

> 1.8.5: PURCHASER to Inspect Property (Environmental Inspection). PURCHASER, at PURCHASER'S expense, shall have the right to obtain an environmental inspection (which inspection may include on-site testing, procedures, and sampling to determine the identification of Hazardous Materials (as defined in Section 2.1.13) on or in close proximity to the Subject

_____

ated with the co-appellant, Richman Enterprises, Ltd. The court will refer to the appellants collectively as "FRI."

[2] The Property had previously been owned by several manufacturing entities: Cone Mills built the property in 1962 and operated thereon until 1976; Riegel Textile Corporation owned the Property from 1976 until 1985; Mount Vernon acquired the property in 1985 and carried on business there until 1987; Kings Mill Realty acquired the Property in 1987, but Mount Vernon reacquired the Property by foreclosure in 1989.

Property, the cost of removal of same, and the source of same) of the Subject Property by licensed professionals and contractors. In the event said inspection discloses the presence of any Hazardous Materials, notice of the presence of Hazardous Materials shall be given to SELLER or SELLER'S agent by PURCHASER in writing on or before Closing. Upon such notice, SELLER shall endeavor to remove from the Subject Property prior to Closing such Hazardous Materials in accordance with all federal, state, and local statutes, regulations, ordinances, and other laws. If SELLER is unable to remove such Hazardous Materials to the reasonable satisfaction of PURCHASER within a reasonable time (not to exceed thirty days (30) after receipt of said notice), PURCHASER may declare this Contract null and void and receive a full refund of the Initial Payment and its Earnest Money in accordance with Section 4.2. If the Contract is declared null and void in accordance with this section, SELLER shall reimburse PURCHASER for one-half (1/2) of any and all reasonable fees, expenses, and costs, not to exceed Ten Thousand and no/100 Dollars ($10,000.00), incurred by PURCHASER regarding the environmental inspection(s) of the Subject Property.

2.1: SELLER'S Representations, Warranties, and Covenants. As an inducement to PURCHASER to enter into this Contract, SELLER, after appropriate inquiry and investigation and with the knowledge that PURCHASER is purchasing the Subject Property in full reliance thereon, represents, warrants, and covenants that:

. . .

2.1.13: SELLER has not caused or permitted the Subject Property to be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, or process Hazardous Materials, or other dangerous, regulated or toxic substances, or solid wastes,

5

except in compliance with all applicable Federal, State, and local laws or regulations, and has not caused or permitted and has no knowledge of the release, as defined in the [CERCLA] of any Hazardous Materials, or other dangerous, regulated, or toxic substances, on or in close proximity to SELLER'S Subject Property. . . .

2.1.14: No representation or warranty in this agreement nor any statement or certificate furnished or to be furnished to the PURCHASER pursuant hereto, or in connection with this transaction contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact regarding SELLER or the Subject Property which would reasonably affect a prudent investor's decision to purchase any of the assets being sold to PURCHASER herein.

4.2.2: If, subsequent to the execution of this contract, SELLER breaches any of the provisions in Section 1 of this Contract or any of the SELLER'S representations and warranties contained in Section 2 of this Contract are proven false, then the PURCHASER shall have the option to (i) declare this Contract to be null and void, receive a full refund of the Earnest Money with any accrued interest thereon, and enforce any additional remedies available to PURCHASER at law or in equity, or (ii) to proceed to Closing and reserve such rights and remedies as may be available to PURCHASER at law or in equity.

4.3.1: Default in Performance. Without limiting any other rights PURCHASER may have at law or in equity, in the event of a material breach by SELLER in the performance of this Contract which is discovered by the PURCHASER after the Closing, PURCHASER shall be entitled to recover the payments theretofore made and to take any other action permitted at law or in equity for the enforcement of PURCHASER'S rights under said Contract.

6

5.12: <u>Governing Law</u>. This Contract shall be governed by and construed in accordance with the laws of the State of South Carolina, notwithstanding any choice-of-law rules thereof.

(emphasis added).

FRI retained Westinghouse Engineering and Geotechnical Services, Inc. ("Westinghouse") to conduct an environmental survey of the Property. The results of the Westinghouse tests revealed large quantities of certain hazardous materials (dichloroethene, tetrachloroethene, and trichloroethene).[3] Mount Vernon retained Sirrine Environmental Consultants ("Sirrine") to conduct a second survey of the groundwater on the Property. The Sirrine survey revealed higher levels of the same contaminants and additionally revealed the presence of tetrachloroethylene. The evidence suggests that the levels of these identified contaminants exceeded the permissible levels specified by relevant environmental laws, including the federal so-called "Safe Drinking Water Act," 42 U.S.C. #8E8E # 300f <u>et seq.</u> (1986), the South Carolina so-called "Pollution Control Act," S.C. Code Ann. § 48-1-10, and the South Carolina Water Classifications and Standards, S.C. Code Regs. 61-68.

The closing date specified in the Contract, April 1, 1991, elapsed without the parties effecting a closing and without the parties agreeing upon an extension. In May 1991, FRI notified Mount Vernon that FRI considered Mount Vernon to be in breach of the Contract and that FRI intended to seek monetary damages. In October 1991, Mount Vernon returned the earnest money to FRI and characterized the Contract as "terminated by mutual assent."[4] On October 10, 1991, FRI responded that it was "incorrect for [Mount Vernon] to state that the parties have terminated the contract by mutual assent. It is also incorrect for

_____

[3] The parties do not appear to dispute that these materials constitute "hazardous materials" as that term is defined in the Contract.
[4] FRI accepted the return of the earnest money and endorsed the check, but noted on the check that its acceptance of the earnest money did not prejudice its right to pursue any other legal remedy provided by law, including breach of contract.

[Mount Vernon] to imply that the purchaser's remedies are limited to refund of the deposit under these circumstances."

FRI filed suit seeking to recover compensatory damages under the theory that Mount Vernon breached the Contract by failing to deliver the Property in accordance with the provisions of the Contract relating to environmental conditions and by making certain false representations relating to the disposal and release of certain hazardous materials on the Property. FRI brought also a claim sounding in tort based upon negligent misrepresentation and nondisclosure. Mount Vernon moved the district court for summary judgment on all claims.[5] The district court granted Mount Vernons motion and concluded that FRI could not declare the contract void and sue for breach. The district court concluded also that FRI could not prove justifiable reliance upon the alleged negligent misrepresentation or nondisclosure of Mount Vernon and, consequently, granted Mount Vernon's motion for summary judgment on the tort claim. FRI now prosecutes this appeal.

II.

We review the district court's grant of summary judgment de novo. Farwell v. Un, 902 F.2d 282, 287 (4th Cir. 1990). Summary judgment is appropriate "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant is entitled to summary judgment"[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587 (1986). The nonmovant, however, is entitled to the most favorable inferences that may reasonably be drawn from the forecast evidence, Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985), but it "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another," Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). The essence of the inquiry the court must make is "whether the evidence presents a suffi-

_____

[5] The defendant had filed a counterclaim in the action but had agreed to a dismissal. Accordingly, Judge Anderson granted the plaintiffs' motion for summary judgment on the counterclaim.

cient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

A. Contract Claims

This case requires this court to make a threshold determination of what legal remedies are available to FRI pursuant both to the terms of the Contract and to the law of the State of South Carolina. The district court concluded that the Contracts remedial provisions limit FRI to two alternative remedies: either (1) to declare the Contract null and void and a return of the earnest money or (2) to affirm the Contract, proceed to the closing and sue for damages. We agree.

The court finds it helpful to summarize its understanding of the interplay between the relevant provisions of the contract. Pursuant to section 1.8.5, FRI could conduct environmental testing. If the testing revealed levels of hazardous materials in excess of the levels allowed by applicable environmental regulations, then the FRI must notify Mount Vernon. Within thirty days of FRI's notification, Mount Vernon must reduce the levels of hazardous materials to levels allowable pursuant to these regulations and reasonably satisfactory to FRI. If Mount Vernon cannot reduce the levels accordingly, then FRI may declare the contract null and void, receive its earnest money (and any interest thereon as allowed under section 4.2), and receive reimbursement from Mount Vernon for one-half of its fees incurred in conducting the environmental testing, up to a limit of $10,000.00.

Pursuant to sections 2.1.13 and 2.1.14, Mount Vernon may make certain representations concerning the characteristics or condition of the Property. If any material representation is subsequently proven false, then FRI has two options under section 4.2.2: (1) to declare the contract null and void and receive any earnest money and interest thereon, or (2) to close the purchase and seek its remedy at law or in equity.

FRI argues that the district court erred in holding that FRI was not entitled to seek money damages, as opposed to exercising what FRI characterizes as "non-exclusive" contractual remedies. FRI claims that under South Carolina law, "remedies provided in a contract are

9

not the exclusive remedies available to the nonbreaching party unless specifically designated as such in the contract." FRI bases its proposition upon the case of Bannon v. Knauss, 320 S.E.2d 470 (S.C. 1984). FRI recites the following passage from Bannon :

> In the absence of clear language in the contract to the contrary, a nonbreaching party may normally elect either to pursue a remedy specified in the contract or to sue for any other remedy available for the breach. The presence of a liquidated damages clause in a contract does not in itself limit the remedies available to the nonbreaching party.

Id. at 472 (citations omitted). FRI, however, fails to account for the first sentence of the very next paragraph of the Bannon opinion: "In a contract for sale of real estate, a clause providing for forfeiture of the earnest money if the purchaser defaults is ordinarily construed as giving the seller the election to disaffirm the contract and retain the earnest money or to affirm it and sue for the purchase price." Id. (citing First Trust & Savings Bank v. Pruitt, et al. , 113 S.E. 469 (S.C. 1922); Stewart v. Griffith, 217 U.S. 323 (1910); Biscayne Shores, Inc. to Use of New Biscayne Shores Co. v. Cook, 67 F.2d 144 (3d Cir. 1933));[6] see generally Richard R. Powell & Patrick J. Rohan, 6A Powell on Real Property: Vendors and Purchasers ¶ 822[2] at 81-214 (1995) ("Upon breach by one of the parties, [either] the remedy of specific performance or the alternative remedy of rescission and restitution will more typically be chosen rather than settling for a judgment that recognizes the breach but awards only nominal damages as compensation for the breach."). Even where it is the purchaser which seeks

_____

[6] In Bannon, the seller initially sought specific performance of the contract, but later mitigated damages by selling the property at a price less than that contemplated by the parties' contract and then sought damages for the difference between the contract price and the actual price received. The court held that the seller was entitled to pursue damages. The court concluded that there was no provision in the contract that made "retention of the earnest money the seller's exclusive remedy" and that "[n]othing suggest[ed] that the parties intended the forfeiture clause to limit the purchaser's liability for breach." Id. Thus, the seller in Bannon had expressly affirmed the contract and was properly entitled to pursue damages.

10

to recover upon the alleged breach by the seller , we are unable to perceive the necessity of departing from this well established premise of South Carolina law, especially where, as here, the contractual terms reflect that well-established premise.**7**

FRI argues also that the court erred in concluding that the remedies provided pursuant to section 4.2.2 of the Contract are exclusive. FRI relies upon the evolutionary history related to section 4.1.1 to prove its point. FRI's argument proves too much however. Section 4.1.1 provides that

> If, subsequent to the execution of this Contract, PURCHASER breaches [the Contract] . . . SELLER shall have the right to declare this Contract to be null and void and retain from the Earnest Money its actual damages caused by PURCHASER, but shall not be precluded from pursuing any other rights SELLER might have at law or in equity.

As an initial matter, the court notes that the remedial provision of section 4.1.1 is triggered when it is the purchaser  who has allegedly breached the Contract. Of course, in the instant action it is the seller who has allegedly breached the Contract, and, therefore, section 4.1.1 is inapplicable to the substantive issue of this case. However, the court is influenced by the inclusion of section 4.1.1 in the Contract. The drafters clearly crafted section 4.1.1 to provide that the Contract's remedial provisions were not to be considered exclusive where the purchaser allegedly breached. However, it is significant that the drafters chose not to use comparable language when addressing the remedies available to the purchaser upon an alleged breach by the seller.**8**

_____

**7 See generally** Powell & Rohan, 6A Powell on Real Property: Purchaser and Vendor, supra, ¶ 882[2] at 81-223 ("Although the liquidated damages agreement can apply to a breach of contract by either the purchaser or the seller, usually the liquidated damages clause is intended to function only in the case of the purchaser's breach.") In the instant case, however, the drafters departed from the "usual" application of the liquidated damages clause, and expressly provided a liquidated damages clause applicable to an alleged breach of contract by the seller.

**8** The court finds it inherently proper to closely scrutinize the language of these respective provisions:

11

Accordingly, because the drafters knew how to provide for the non-exclusivity of remedies available to the seller for the purchaser's alleged breach, as set forth in section 4.1.1, but purposefully limited the remedies available to the purchaser and declined to include an express non-exclusivity provision, as set forth in section 4.2.2, the court is convinced that the district court correctly concluded that the purchaser was limited to the two remedial options set forth in section 4.2.2.[9] The court now turns its attention to which of these two remedial options FRI chose.

The district court stated that FRI "has already taken its remedy in the contract." This court assumes that the district court concluded that FRI took its remedy in the Contract by accepting the proffered refund of its earnest money. The district court obviously concluded that the FRI's acceptance of its earnest money evinced its intention of rescinding the Contract and taking the applicable remedy as provided by the

_____

> The parties themselves may fix the remedy for breach in the contract through a liquidated damages provision. Often, the language of the liquidated damages clause is flexibly designed to preserve the option of the non-breaching party to use the liquidated damages remedy or to seek one of the normal remedies for breach. Occasionally, however, the language may tie the parties to the liquidated damages remedy as the exclusive remedy.

Powell & Rohan, 6A Powell on Property, supra, at 81-215. The court concludes that the drafters did not "flexibly design" the language of section 4.2.2 to permit the purchaser to seek non-contractual remedies. The court is not bothered by the absence of "magic words" such as, "The remedies enunciated herein shall be the exclusive remedies of the PURCHASER."

[9] Similarly, section 4.3.1 is inapplicable yet instructive. Section 4.3.1 provides that the purchaser shall be entitled to recover all payments tendered and may take any other action permitted at law or in equity for an alleged breach by the seller which is discovered by the purchaser after the Closing. Section 4.3.1 is inapplicable to the instant action because FRI did not proceed to closing. However, section 4.3.1 is instructive because it is again apparent to the court that the drafters of the contract knew how to specify whether contractual remedies were to be non-exclusive.

12

Contract -- "a full refund of the Earnest Money." FRI argues, however, that it "never declared the Contract null and void." FRI argues that when it became apparent that Mount Vernon could not remedy the environmental condition of the Property, then FRI "declared a breach and advised Mt. Vernon that FRI would seek to recover all damages caused by the breach." The court is called upon to determine which remedial option of section 4.2.2 -- rescission or affirmation of the Contract -- is implied by FRI's behavior.

The court agrees with the district court that FRI rescinded the Contract. In order to recover monetary damages for a breach of the Contract, FRI was required to "proceed to Closing and reserve such rights and remedies as may be available to PURCHASER at law or in equity." Section 1.5 of the Contract specified April 1, 1991, as the Closing date. It is undisputed that the parties did not close on April 1, 1991, and there is no evidence in the record that the parties expressly extended the closing date. Additionally, section 5.6 of the Contract provided that "[t]ime is of the essence." However, the court acknowledges that parties may waive a "time is of the essence" provision expressly by modifying the terms of the contract or implicitly by extending the time of performance. See generally 77 Am. Jur. 2d: Vendor and Purchaser, § 80 at 266 (1975). Accordingly, the court discounts the binding effect of the "time is of the essence" provision because the parties may have implicitly extended the time of performance by continuing to negotiate after the stipulated closing date of April 1, 1991. Thus, while the closing date of April 1, 1991, elapsed without the parties effecting the closing and while there was a "time is of the essence" provision resident in the Contract, the court concludes that FRI did not necessarily elect to rescind the Contract by failing to proceed to closing on April 1, 1991.

However, FRI did expressly decline to effect the closing at a later date. By letter dated July 26, 1991, Mount Vernon's representative, E. G. Cochrane II ("Cochrane"), wrote to counsel for FRI:

> Please let us know at once whether your client wishes to proceed to closing. We would like to have the closing on or before Tuesday, August 20, 1991. If your client does not want to do this, and desires to get out of the purchase con-

13

tract, we have no objection, and we will refund the deposit (with its accrued interest).

By letter dated June 17, 1991,[10] counsel for FRI responded: "This law firm is studying the remedies available to Purchaser. In the interim, we wanted to inform you that Purchaser has no intention `to proceed to closing' as provided in your letter of July 26, 1991." (emphasis added). Accordingly, by examining the totality of FRI's conduct during the period from February 14, 1991 to sometime after July 26, 1991 -- (1) the elapsing of the closing date without effecting a closing; (2) the May 15, 1991 declaration that FRI considered Mount Vernon to be in breach; and (3) the post-July 26, 1991 explicit refusal "to proceed to closing" -- the court concludes that FRI rescinded the Contract between it and Mount Vernon because FRI expressly elected not to avail itself of its only alternative remedy:"to proceed to Closing and reserve such rights and remedies as may be available to PURCHASER at law or in equity."

B. Tort Claims

FRI appeals also the district court's denial of its claim sounding in tort for negligent misrepresentation or nondisclosure. The district court concluded that FRI could not demonstrate that it justifiably relied upon the representations of Mount Vernon concerning the environmental condition of the Property in deciding to pursue the purchase. Again, we agree.

Pursuant to South Carolina law, an entity may bring a common law action in tort for negligent misrepresentation. Gilliland v. Elmwood Properties, 391 S.E.2d 577 (S.C. 1990); Winburn v. Insurance Co. of North America, 339 S.E.2d 142 (S.C. Ct. App. 1985). "A seller does have a duty to disclose `an artificially created, and concealed, unstable condition.'" Greenwood Mills, Inc. v. Russell Corp., 981 F.2d 148, 150 (4th Cir. 1992) (quoting Lawson v. Citizens & S. Nat'l Bank of S.C., 193 S.E.2d 124, 128 (S.C. 1972)); see also Lawson, 193 S.E.2d at 128 ("Where material facts are accessible to the vendor

_____

[10] The court notes the obviously incorrect date of June 17, 1991. The letter dated June 17, 1991, recites the date of Mount Vernon's letter -- July 26, 1991.

14

only, and he knows them not to be within the reach of the diligent attention, observation and judgment of the purchaser, the vendor is bound to disclose such facts and make them known to the purchaser.") (emphasis added). In AMA Management Corp. v. Strasburger, 420 S.E.2d 868, 872 (1992), the Court of Appeals of South Carolina set forth the requisite elements of a claim of negligent misrepresentation:

> If the damage alleged is a pecuniary loss, the plaintiff must allege and prove the following essential elements to establish liability for negligent misrepresentation: (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation.

Id. (emphasis added). In determining whether the plaintiff justifiably relied upon the representation, "[t]here is no liability for casual statements, representations as to matters of law, or matters which plaintiff could ascertain on his own in the exercise of due diligence." Id.

In the instant action, the court can ascertain only two possible instances of alleged misrepresentation. First, FRI claims that Mount Vernon did not disclose in the brochure that Cone Mills had previously owned the Property. Second, FRI claims that Mount Vernon made several misrepresentations concerning the environmental condition of the Property. FRI claims that a false statement -- "ENVIRONMENTAL CONSIDERATIONS -- NO KNOWN OR EXPECTED ENVIRONMENTAL HAZARDS" -- was purposefully included in the brochure to induce FRI to purchase the property. FRI claims also that Cochrane advised FRI that "there were no environmental problems with the Property." The court cannot conclude that FRI has demonstrated that it justifiably relied upon either of these two representations to its detriment.

First, the matter of Cone Mills' prior ownership of the property was a fact that should have been readily discovered by FRI if it had exer-

15

cised due diligence in checking certain public records. Second, although Mount Vernon represented that there were no known environmental hazards or problems, the evidence clearly suggests that FRI did not rely upon this representation to its detriment. Indeed, section 1.8.5 of the Contract indicates that the drafters anticipated that there may exist concealed environmental problems, unknown to either party, that could be revealed only upon detailed environmental inspection. The Contract provided the mechanism by which FRI could "conduct a thorough environmental investigation and avoid the losses it might well have sustained if it had prematurely entered into a purchase agreement." Greenwood Mills, 981 F.2d at 150. If FRI had relied completely upon Mount Vernon's representations of environmental condition, then presumably FRI would not have bargained for the inclusion of section 1.8.5 in the Contract and would not have incurred the costs of independent environmental testing. Additionally, the court notes that FRI, like Russell Corporation in Greenwood Mills, is a textile manufacturer and should have been aware that latent environmental hazards could exist on the Property and that such environmental hazards may be unknown to the present owner. Accordingly, we will affirm the district court because we find, as a matter of law, that FRI has failed to demonstrate that it justifiably and detrimentally relied upon the alleged misrepresentations of Mount Vernon.

III.

Under the circumstances of this case, the court is convinced, as apparently was the district court, that FRI received exactly that for which it bargained. Mount Vernon made certain representations concerning the environmental condition of the Property; however, the terms of the Contract anticipated that there may exist latent environmental hazards. Accordingly, the Contract provided FRI with an "escape" if subsequent environmental testing revealed hazards which Mount Vernon could not remedy within thirty days. If Mount Vernon could not remedy the revealed environmental hazards, then FRI was entitled either to rescind the Contract and receive its earnest money or to proceed to Closing and reserve its rights and remedies available at law or in equity. The purchase scenario unfolded consistent with the contingencies contemplated in the Contract: the environmental testing revealed hazards that Mount Vernon could not satisfactorily remedy within thirty days; FRI did not proceed to close on the estab-

16

lished closing date and expressly declined to close at a later date; and, Mount Vernon considered FRIs refusal to Close as a rescission of the Contract and accordingly returned FRI's earnest money plus interest. FRI has taken its remedy contemplated by the Contract. FRI cannot now look to the courts to provide an extra-contractual remedy for which it did not bargain. Accordingly, the judgment of the district court shall be, and it hereby is,

AFFIRMED.

17